**UNITED STATES of America,**

v.

**John F. "Duffy" CONLEY, William C. Curtin, Sheila F. Smith, John Francis "Jack" Conley, Thomas "Bud" McGrath, Mark A. Abbott, Thomas Rossi, William Steinhart, Roberta Fleagle, Robin Spratt, Monica C. Kail, William J. Reed, Joanne T. Smith, Kenneth "Ron" Goodwin, Lawrence N. "Neudy" Demino, Sr., Christopher "Chris" Kail, Joseph A. Devita, Frank Garofalo, Thomas D. Ciocco, Michael Sukaly, Phillip M. "Mike" Ferrell, Anestos "Naz" Rodites, and William E. Rusin, Defendants.**

Crim. No. 91–178.

United States District Court, W.D. Pennsylvania.

Jan. 7, 1994.

Memorandum Opinion on Reconsideration June 27, 1994.

Frederick W. Thieman, U.S. Atty., W.D.Pa., James R. Wilson, Asst. U.S. Atty., William D. Braun, Crim. Div., U.S. Dept. of Justice, Washington, DC, for plaintiff.

James Wymard, William Difenderfer, Anthony Mariani, Ellen Viakley, Gary Gerson, Caroline M. Roberto, Joel Johnston, Stanley Greenfield, Martha Bailor, Ray Radokovich, Carmen Martucci, Lee Markovitz, Edward J. Osterman, William Acker, Foster Stewart, Joseph Kanfoush, Carl Max Janavitz, Raymond M. Maloney, John Goodrich, Gary B. Zimmerman, Vincent Baginski, John Zagari, James Andring, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION

LEE, District Judge.

Before the Court is Defendant John F. "Duffy" Conley's motion to suppress his statement at the Main Hotel on October 30, 1989. (Document No. 377, in part).

*FINDINGS OF FACTS*

*The Encounter at the Windgap Facility*

1. During the month of October, 1989, Federal Bureau of Investigation Special Agent John Donnelly ("S.A. Donnelly") was in the midst of an investigation into organized crime and gambling devices.

2. Although there was an ongoing, independent federal investigation of John F. "Duffy" Conley ("Conley"), S.A. Donnelly was not aware of it. Conley was not a target of S.A. Donnelly's investigation.

3. S.A. Donnelly sought out Conley, whose name had surfaced in the records of the Arnold Coin Company during S.A. Donnelly's investigation, in order to secure Conley's cooperation in his investigation.

4. In the middle of October, 1989, S.A. Donnelly arrived unannounced at Conley's office at the Windgap Avenue facility of Duffy's Vending, Conley's company.

5. S.A. Donnelly introduced himself to Conley as an FBI agent and indicated that he wanted Conley to give him information regarding video poker machine operations.

6. Conley, who had legal problems and concerns regarding his own video poker machine operations, was alarmed by the presence of an FBI agent. Conley asked whether the conversation would be off the record.

7. S.A. Donnelly told Conley that he was willing to speak off the record and Conley was not the target of the investigation. Both S.A. Donnelly and Conley understood that nothing said would be used against Conley.

8. Although never getting specific about what could be done for Conley, S.A. Donnelly intimated that he was in a position to help Conley. S.A. Donnelly contemplated assisting Conley if Conley agreed to enter into a relationship as a cooperating witness.

9. S.A. Donnelly directed Conley's attention to poker machine gambling. He inquired into Conley's relationships with other vending companies in western Pennsylvania. He also inquired into Conley's knowledge of the activities of Ninny Lagatutta, Sonny Ciancutti and the Arnold Coin Company.

10. Conley stated that he knew Ninny Lagatutta was in the vending business. Conley and S.A. Donnelly discussed a video poker machine location in the Brookline section of Pittsburgh that was owned by Lagatutta. Conley did not tell S.A. Donnelly of any illegal activities by any person or company in response to S.A. Donnelly's inquiries.

11. S.A. Donnelly asked Conley if he was willing to discover information about the aforementioned persons and company. S.A. Donnelly primarily focused his attention on Ninny Lagatutta.

12. Conley was non-committal, neither agreeing or refusing to seek the requested information on behalf on S.A. Donnelly.

13. S.A. Donnelly and Conley agreed to get in touch in the future, and S.A. Donnelly gave his card to Conley.

14. Neither S.A. Donnelly nor Conley took notes during, or otherwise recorded, the encounter at Windgap.

15. S.A. Donnelly maintained a friendly, non-adversarial demeanor throughout the encounter at Windgap.

16. The encounter, which lasted between five and twenty minutes, ended amicably.

*The Encounters at the Main Hotel*

17. On October 30, 1989 S.A. Donnelly and Special Agent Patricia Moriarity went to the Main Hotel in Carnegie, Pennsylvania in a limited undercover capacity.

18. Although S.A. Donnelly had information that the Main Hotel was a location where Conley maintained video poker machines, he did not "know positively" that this information was accurate.[1]

19. S.A. Donnelly was still conducting his independent investigation, in which Conley was not a target.

20. S.A. Donnelly and S.A. Moriarity were sitting at the bar having coffee when Conley arrived. Conley greeted the bartend-

---

1. At one point in his direct testimony, S.A. Donnelly indicated that he asked Conley about his ownership of the machines, though he already knew the answer. (N.T. July 8, 1992, at 5).

er and began emptying money out of a pinball machine.

21. Conley approached the bar to speak with the bartender regarding the division of the money taken from the machines. Conley recognized S.A. Donnelly. S.A. Donnelly initiated a conversation with Conley, saying hello and calling him as "John" or "Duffy." [2]

22. S.A. Donnelly reintroduced himself, reminding Conley that he was the FBI agent who had visited him. Conley indicated that he remembered him. S.A. Donnelly also introduced Patricia Moriarity as an FBI agent.

23. S.A. Donnelly asked Conley whether the pinball machines on the premises were Conley's machines and whether the video poker machines on the premises were Conley's machines. Conley answered that the machines were his machines.

24. S.A. Donnelly then invited Conley to sit down, have some coffee and talk. Conley replied that he was late for an errand and had to leave, but he was willing to return and talk.

25. S.A. Donnelly and S.A. Moriarity escorted Conley outside, and Conley left on his errand. The agents went to their car to wait and see if Conley would return.

26. The initial encounter at the Main Hotel lasted approximately five minutes.

27. Between fifteen and thirty minutes passed, but Conley in fact returned to talk to S.A. Donnelly. S.A. Donnelly, S.A. Moriarity and Conley reconvened in the bar of the Main Hotel.

28. S.A. Donnelly did not inform Conley whether they were speaking on the record or off the record.

29. S.A. Donnelly did not inform Conley whether Conley's statements would be used against him.

30. S.A. Donnelly did not inform Conley of his *Miranda* rights.

31. After Conley mentioned that he had ongoing legal problems implicating his association with the Pennsylvania Association of Video Operators ("PAVO"), S.A. Donnelly informed Conley that Conley was under no obligation to speak with him and informed Conley that the agents "did not want to hear anything about that, about his legal problems at all." (N.T. July 8, 1992, at 8).

32. S.A. Donnelly stated that he had observed patrons of the Main Hotel receiving pay-offs from the bartender. Conley replied that such a scenario was entirely possible.

33. S.A. Donnelly and Conley discussed PAVO.

34. When S.A. Donnelly opined that Conley was in violation of federal law, Conley inquired as to what federal law he was violating. S.A. Donnelly cited the Illegal Gambling Business statute, and Conley expressed ignorance of the provisions of that statute. S.A. Donnelly then told Conley that he should ask his counsel about the statute and asked Conley who represented him. At that point, Conley informed S.A. Donnelly that his counsel was William Difenderfer.[3]

35. S.A. Donnelly never told Conley that he had a right to consult counsel during the encounter. S.A. Donnelly never told Conley that he should discuss his conduct with coun-

2. This paragraph is from S.A. Donnelly's direct testimony. Conley's testimony on cross is consistent with that of S.A. Donnelly, but less specific. Conley testified, "I saw him at the Main Hotel and I recognized him. I went up and was talking to him, and he just, basically, you know, said hello and this and that and wanted to know what was going on, if I had a chance to find out anything for him on the people that we discussed." (N.T. June 3, 1993, at 10).

3. The Government has attempted to convey the impression that the substance of *Miranda* warnings were given to Conley. The Government presented evidence that when Conley was making certain "statements," S.A. Donnelly said that

Conley should consult with his attorney. This evidence was joined with evidence about Conley's being informed that he was not obligated to speak with S.A. Donnelly. (N.T. July 8, 1992, at 6, 66–68) (Document No. 470); *see also* (N.T. June 3, 1993 at 47–50) (Document No. 713). The Government has failed to persuade the Court. The Government's position involves temporal conflation of the exchange between S.A. Donnelly and Conley, and the "statements" that prompted S.A. Donnelly to raise the issue of Conley's attorney related to matters of law, rather than incriminating factual statements by Conley.

sel before making any incriminating statements.

36. S.A. Donnelly and Conley discussed Conley's recent arrest on state gambling charges and the preliminary hearing scheduled for November 3, 1989.

37. In response to a question regarding his conduct being illegal under state and federal law, Conley stated that he had no intention of leaving the video poker machine business. Conley stated that poker machine locations and his employees were dependant upon the business, and he had no intention of laying-off employees.

38. S.A. Donnelly broached the subject of the Arnold Coin Company, asking Conley if he had found any information. Conley admitted that he had done business with the company through an informal partnership, but Arnold Coin Co. sent a letter stating that it did not want to continue the relationship.

39. S.A. Donnelly asked if Conley had found out what locations Ninny Lagatutta had. Conley stated S.A. Donnelly probably knew as well as he did, because Conley's only way of knowing was his own involvement with video poker machines in town. Conley further stated that he knew Ninny Lagatutta and spoke with him about machines, but Conley did not have information about Ninny Lagatutta being involved in anything else.

40. S.A. Donnelly urged Conley to find out more about Ninny Lagatutta. Conley stated that if he heard anything more, he would let S.A. Donnelly know.

41. S.A. Donnelly asked Conley if he had any information on Sonny Ciancutti and the New Kensington area.

42. S.A. Donnelly asked if Sonny Ciancutti or Ninny Lagatutta had ever approached Conley seeking "tribute" or trying to "muscle" him. Conley stated that he had never been approached by any organized crime figure. He further stated a belief that the federal government had declared poker machines illegal because organized crime was mistakenly believed to have infiltrated the video poker machine business.

43. The encounter ended amicably, with Conley acknowledging that he had S.A. Donnelly's telephone number in the event that he had more information.

44. The second encounter at the Main Hotel lasted twenty to thirty minutes.

45. Neither S.A. Donnelly nor Conley took notes during, or otherwise recorded, the encounters at the Main Hotel.

46. S.A. Donnelly maintained a friendly demeanor throughout both encounters with Conley at the Main Hotel.

47. S.A. Moriarity observed, but did not participate in, the conversations between S.A. Donnelly and Conley during the second encounter at the Main Hotel.

48. At the conclusion of the second encounter, S.A. Donnelly returned to his office in Pittsburgh and wrote out a draft FD–302, which was subsequently typed.

49. S.A. Donnelly did not believe that the encounter at the Main Hotel was off the record.

50. Conley believed that the encounter at the Main Hotel was off the record. Conley would not have engaged S.A. Donnelly in this conversation had Conley believed that it was on the record.

51. Conley's belief that the encounter at the Main Hotel was off the record was reasonable under the totality of the circumstances.

52. On October 30, 1989, Conley was around twenty-nine or thirty years old.

53. Conley is neither uneducated nor unintelligent.

## DISCUSSION

Statements not obtained in violation of a person's *Miranda* rights or right to counsel are nonetheless subject to suppression as violative of due process if the statements are "coerced" or "involuntary." *Arizona v. Fulminante*, 499 U.S. 279, 287–91, 111 S.Ct. 1246, 1253–54, 113 L.Ed.2d 302 (1991); *Lego v. Twomey*, 404 U.S. 477, 483, 92 S.Ct. 619, 623–24, 30 L.Ed.2d 618 (1972). A statement is coerced or involuntary if the behavior of "law enforcement officials was such as to overcome the will to resist and bring about a confession not freely self-deter-

mined." *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961). Coercive police activity is a necessary predicate to finding a confession involuntary. *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521–22, 93 L.Ed.2d 473 (1986). There must be some causal connection between the police conduct and the confession. *Id.* at 164, n. 1, 107 S.Ct. at 520, n. 1. It is the government's burden to show by a preponderance of the evidence that the challenged statements are voluntary. *Lego,* 404 U.S. at 483, 92 S.Ct. at 623–24. The ultimate issue of voluntariness, however, is a question of law for the Court. *Fulminante,* 499 U.S. at 285–87, 111 S.Ct. at 1252.

The Court must examine the totality of the circumstances in order to determine if a confession was coerced or involuntary. *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). In determining whether the defendant's will was overborne in a particular case, a court must assess the totality of all the surrounding circumstances, both the characteristics of the accused and the details of the interrogation. *Schneckloth,* 412 U.S. at 266, 93 S.Ct. at 2067–68. For example, a court should look to the following:

> the youth of the accused; his lack of education or low intelligence; the lack of any advice to the accused of his Constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as deprivation of food or sleep.

*Id.* at 226, 93 S.Ct. at 2047. It is well established that an involuntary confession may result from psychological, as well as physical, coercion. *Miller v. Fenton,* 796 F.2d 598, 603 (3d Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986).

A promise by a law-enforcement officer may qualify, under the circumstances, as coercion. *See Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 203–04, 50 L.Ed.2d 194 (1976); *Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 347–48, 83 S.Ct. 448, 453–54, 9 L.Ed.2d 357, *rehearing denied,* 372 U.S. 950, 83 S.Ct. 931, 9 L.Ed.2d 975 (1963); *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897); *United States v. Fraction,* 795 F.2d 12, 14–15 (3d Cir.1986); *United States v. Pinto,* 671 F.Supp. 41, 59–60 (D.Maine 1987). In particular, where an express or implied promise not to use statements against, or not to prosecute, a declarant is made, *see Fraction,* 795 F.2d at 14–15, is not contingent or qualified, *see Shotwell Mfg. Co.,* 371 U.S. at 348–52, 83 S.Ct. at 453–56; *United States v. Fountain,* 776 F.2d 878, 884 (10th Cir.1985); *United States v. Nussen,* 531 F.2d 15, 20–21 (2d Cir.), *cert. denied,* 429 U.S. 839, 97 S.Ct. 112, 50 L.Ed.2d 107 (1976), and in fact induces the statement, *see Fraction,* 795 F.2d at 15; *Fountain,* 776 F.2d at 885–86, the promise is of such a nature that it can easily be found to have overcome a person's resistance to giving a statement to authorities. *Shotwell Mfg. Co.,* 371 U.S. at 347–48, 83 S.Ct. at 453–54; *United States v. Powe,* 591 F.2d 833, 845 & n. 36 (D.C.Cir. 1978); *Grades v. Boles,* 398 F.2d 409, 412 (4th Cir.1968); *Pinto,* 671 F.Supp. at 56–58; *see also Rowe v. Griffin,* 676 F.2d 524, 527 (11th Cir.1982) ("We note that, under the self-incrimination clause of the fifth amendment, evidence of guilt induced by a government promise of immunity is 'coerced' evidence and may not be used against the accused") (dictum).

A promise that statements made will not be used against the declarant purports to remove the specter of proving one's own guilt by making a statement. Such a promise is a truly powerful one, going to the heart of a declarant's reservations about giving a statement.[4] *Cf. Holland v. McGinnis,* 963 F.2d 1044, 1051 (7th Cir.1992) (Police trickery in form of exaggerating the strength of evidence against a defendant "did not interject

---

4. After this Memorandum Opinion was prepared in draft form, the opinion of the Court of Appeals for the Third Circuit in *United States v. Walton,* 10 F.3d 1024 (3d Cir.1993) came to this Court's attention. This Court has reviewed *Walton* and finds that it buttresses the Court's resolution of this motion. *See Walton,* 10 F.3d at 1029–30

("[G]iven the uniquely influential nature of a promise from a law enforcement official not to use a suspect's inculpatory statement, such a promise may be the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances").

the type of extrinsic consideration that would overcome [the defendant's] will by distorting an otherwise rational choice of whether to confess or remain silent"), *cert. denied,* — U.S. ——, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993).

■ Promises to inform the prosecutor of cooperation or to provide mental treatment are distinguishable from promises not to use statements because the former promises are addressed to collateral problems. *Miller v. Fenton,* 796 F.2d 598, 610 (3d Cir.1986) ("While promises of help with collateral problems have been found, in combination with other coercive factors, to render confessions involuntary, ... in general, such promises are less coercive to the accused than promises directly related to the criminal proceedings at hand") (citations omitted); *see also Streetman v. Lynaugh,* 812 F.2d 950, 957 (5th Cir.1987) ("[C]ertain promises, if not kept, are so attractive that they render a resulting confession involuntary.... A promise of immediate release or that any statement will not be used against the accused is such a promise") (citations omitted); *United States v. Shears,* 762 F.2d 397, 402 & nn. 4–5 (4th Cir.1985); *State v. Waugh,* 238 Kan. 537, 712 P.2d 1243 (1986); *State v. Erks,* 214 Neb. 302, 333 N.W.2d 776 (1983); *State v. Rook,* 304 N.C. 201, 283 S.E.2d 732 (1981), *cert. denied,* 455 U.S. 1038, 102 S.Ct. 1741, 72 L.Ed.2d 155 (1982).[5]

■ Once coercion infects the dynamic of the investigative process, the process is tainted until the circumstances have evolved in such a manner as to dissipate or attenuate the taint of the coercion. *See Oregon v. Elstad,* 470 U.S. 298, 310, 105 S.Ct. 1285, 1293–94, 84 L.Ed.2d 222 (1985); *Westover v. United States,* 384 U.S. 436, 494, 496–97, 86 S.Ct. 1602, 1638, 1639–40, 16 L.Ed.2d 694 (1966); *United States v. Anderson,* 929 F.2d 96, 102 (2d Cir.1991); *Quartararo v. Mantello,* 715 F.Supp. 449, 460–66 (E.D.N.Y.) (taint of promises of lenience not dissipated), *aff'd,* 888 F.2d 126 (2nd Cir.1989);. As the *Elstad* Court indicated regarding successive confessions:

When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession. *See Westover v. United States, decided together with Miranda v. Arizona,* 384 U.S., at 494, 86 S.Ct., at 1638; *Clewis v. Texas,* 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967).

*Elstad,* 470 U.S. at 310, 105 S.Ct. at 1293–94. In analyzing dissipation of the taint of coercion, the inquiry is fundamentally the same as the voluntariness inquiry: Under the circumstances, was the challenged statement an "act of free will?" *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963).

■ Turning to the totality of the circumstances in this case, the Court concludes that Conley's statements at the Main Hotel on October 30, 1989 were involuntary, coerced statements. Although the "typical" indicators of coercion are not present in this case, S.A. Donnelly's promise to speak off the record and his friendly manner combined to overcome Conley's reticence about making statements to the FBI.

It is undisputed that Conley was not in custody during any of his encounters with S.A. Donnelly. He suffered no physical punishment whatsoever, and none was threatened. The combined duration of his two encounters with S.A. Donnelly at the Main Hotel was approximately one-half of an hour. Conley is a man in his early thirties who is neither unintelligent nor uneducated. Although he was never advised of his right to remain silent, Conley nonetheless was aware of—and asserted—that right.

At the outset of the initial meeting at the Windgap, Conley asked if what he said was off the record. S.A. Donnelly assured Conley that he was willing to speak of the record and, furthermore, that Conley was not the target of the investigation. Both S.A. Don-

---

5. Although promises on collateral matters still must be considered as part of the totality of the circumstances, such promises are considered less likely to induce statements. *E.g., Miller,* 796 F.2d at 608–09; *United States v. Robinson,* 698 F.2d 448, 455 (D.C.Cir.1983).

nelly and Conley understood that nothing said would be used against Conley.

The promise was express and direct as to being off the record, and it clearly implied that nothing Conley said would be used against him. This promise went to the heart of Conley's manifest reservations about speaking to the FBI about matters that could easily incriminate him. The promise was unqualified and not contingent upon cooperation or truthfulness; it was not limited to specific topics. Aware of his right to remain silent, Conley was induced by this promise to forego standing on his rights and to entertain S.A. Donnelly's requests for information. Conley's will to stand on his right to remain silent was overcome by S.A. Donnelly's assurances.

At no time during the encounter at Windgap did S.A. Donnelly state or do anything to dispel his and Conley's understanding that nothing Conley said would be used against him. Although S.A. Donnelly was apparently willing to enter into a more formal agreement with Conley if he deemed Conley cooperative, he did not mention such a formal agreement. S.A. Donnelly did not express that the potential use Conley's statements depended upon such a formal agreement or that further statements by Conley would be used against him because no formal agreement was reached.

S.A. Donnelly remained friendly throughout the encounter at Windgap. He asked Conley to obtain further information. Although Conley was non-committal in this regard, S.A. Donnelly and Conley agreed to get in touch in the future, and S.A. Donnelly gave Conley his card containing his telephone number. Clearly, at this point, S.A. Donnelly had taken no action that would attenuate the force of his promise on Conley's will to stand on his rights, and, moreover, S.A. Donnelly and Conley contemplated further contacts in the course of S.A. Donnelly's investigation.

■ At no time during the encounters at the Main Hotel did S.A. Donnelly or S.A. Moriarity take any action to attenuate the force of S.A. Donnelly's previous promise. S.A. Donnelly, using a friendly manner, reminding Conley of who he was, and implicitly referencing their previous encounter, initiated the first encounter at the Main Hotel. S.A. Donnelly asked Connelly about Conley's ownership of machines at the Main Hotel. Thereafter, S.A. Donnelly invited Conley to have coffee and to talk. During the first encounter at the Main Hotel, S.A. Donnelly did not manifest any change of heart as to their previous understanding, and took no action that would attenuate the effect of his previous promise.

The second encounter at the Main Hotel occurred after Conley returned from his business errand. After Conley mentioned that he had ongoing legal problems regarding PAVO, S.A. Donnelly informed Conley that Conley was not obligated to speak with him, but he also assured Conley that the agents "did not want to hear anything about that, about his legal problems at all." S.A. Donnelly then asked Conley about the payoffs that the Main Hotel bartender had made before Conley arrived, and a discussion of Conley's legal problems, including PAVO, ensued. It was in the course of this conversation that the subject of Conley's attorney arose. S.A. Donnelly stated that Conley's legal problems included being in violation of the Illegal Gambling Business statute, and S.A. Donnelly suggested that Conley should discuss the statute's provisions with his attorney. Having discussed Conley's legal problems, S.A. Donnelly turned the conversation to the subject of his investigation of organized crime and video poker machine gambling, covering the same subject matter as the discussion at Windgap.

S.A. Donnelly's statement that Conley did not have to talk to him, in context, did not attenuate the force of his previous promise not to use Conley's statements against him. Because S.A. Donnelly's promise was not contingent upon cooperation and full disclosure, this statement did not in fact put Conley on notice that S.A. Donnelly no longer felt himself bound by his promise not to use Conley's statements against him. S.A. Donnelly's statement would not have put an objectively reasonable person on notice. To the contrary, according to S.A. Donnelly's direct testimony, this statement was coupled with a disclaimer of interest in Conley's legal

problems. As S.A. Donnelly had assured Conley at Windgap, at the time he promised to speak off the record, that Conley was not a target in his investigation, this disclaimer of interest reinforced, rather than attenuated, the effect of S.A. Donnelly's promise on Conley's will to stand on his rights.

S.A. Donnelly's advice to Conley about consulting his attorney regarding the provisions of the federal illegal gambling business statute was just that—not an admonition to consult counsel before making potentially incriminating statements. S.A. Donnelly's advice came towards the end of their discussion of Conley's problems and before the discussion turned to organized crime and video poker machine gambling, rather than at the outset of the second encounter at the Main Hotel. It arose in a different context than the statement about Conley's lack of obligation to speak and the disclaimer of interest in Conley. Moreover, S.A. Donnelly's advice is not inconsistent with not using Conley's statements against him. There being no contention that S.A. Donnelly and Conley understood that Conley would not be prosecuted

for his own activity, and given S.A. Donnelly's friendly demeanor throughout his dealings with Conley, a reasonable person could interpret S.A. Donnelly's statement as friendly advice to a potential informant.

The Government also relies on the presence of S.A. Moriarity at the Main Hotel to distinguish the encounter at Windgap from the encounters at the Main Hotel. Had S.A. Moriarity controlled the conversation or even participated in it beyond her being introduced to Conley, her conduct might have had an attenuating effect. She did not. The Government has not shown that Conley was aware of any FBI practice to use two agents when an interview is for the record. Moreover, S.A. Donnelly included S.A. Moriarity in his disclaimer of interest in Conley.

At Windgap, S.A. Donnelly made a promise to Conley that they could speak off the record.[6] The clear implication, and the understanding of both S.A. Donnelly and Conley, was that Conley's statements would not be used against him. This promise was unqualified and unconditional.

---

6. Regarding promises that could render a statement involuntary, the *Fraction* court stated:

> In this context, a "promise" is an offer to perform or withhold some future action *within the control of the promisor*, in circumstances where the resulting action or inaction will have an impact upon the promisee. A promise is not the same thing as a prediction about future events beyond the parties' control or regarded as inevitable.

*Fraction*, 795 F.2d at 15 (emphasis added). *Fraction* should not be read to require that a promise be within the lawful scope of an agent's authority. It dealt with a situation where an agent merely stated the inevitable. *Id.* While the statement, "The sun will still rise tomorrow if you confess," is a statement of the inevitable, the statement, "You will live to see the sun rise tomorrow if you confess," is not. That the latter statement is not within the lawful scope of an agents authority does not make it irrelevant to the voluntariness inquiry. *See Miller*, 796 F.2d at 609 n. 10 ("The inquiry is really whether, under the totality of the circumstances, the statement induced the confession, not whether it was, on its face, a promise").

In this case, the Government has not argued or attempted to prove that S.A. Donnelly's promise was not authorized by a prosecutor. The Court notes the impracticality that could be visited upon potential agent-informant relationships absent promises such as S.A. Donnelly's promise. Use immunity is statutorily based, 18 U.S.C.

§ 6002, and granted by a judge upon application of a prosecutor. Nonetheless, the discretion invested in prosecutors includes the power to enter into informal grants of immunity and agreements not to prosecute. *United States v. Skalsky*, 857 F.2d 172, 175–76 (3d Cir.1988); *Sklar v. Ryan*, 752 F.Supp. 1252, 1259–60 & n. 6 (E.D.Pa.1990), *aff'd*, 937 F.2d 599 (3rd Cir.1991); *see also United States v. Harvey*, 869 F.2d 1439, 1443–44 (11th Cir.1989); *United States v. Weiss*, 599 F.2d 730, 735 n. 9 (5th Cir.1979); *United States v. Carter*, 454 F.2d 426, 427–28 (4th Cir.1872). As to potential prejudice to society's interest in prosecuting the informants that may inhere in promises such as S.A. Donnelly's promise, the Court finds what was said by the *Carter* court regarding non-prosecution agreements entered into by U.S. Attorneys equally applicable to promises by agents not to use statements made by potential informants:

> If there be fear that an United States Attorney may unreasonably bargain away the government's right and duty to prosecute, the solution lies in the administrative controls which the Attorney General of the United States may promulgate to regulate and control the conduct of cases by the United States Attorneys and their assistants.

*Carter*, 454 F.2d at 428. In short, it is the making of the promise in this case that is relevant to the voluntariness inquiry, rather than the question of whether the promise was, or should be, within the lawful authority of S.A. Donnelly.

S.A. Donnelly and Conley both contemplated the possibility of further contacts at the conclusion of the Windgap encounter. Thus, the passage of approximately two weeks did not operate to diminish the force of S.A. Donnelly's promise.

At the Main Hotel, S.A. Donnelly never expressly stated that Conley was speaking for the record or that his statements could be used against him. The conduct of S.A. Donnelly and S.A. Moriarity, the content of the discussions at the Main Hotel and the circumstances surrounding them did not give notice that S.A. Donnelly's promise was no longer in force.

Rather than militating in favor of a determination of voluntariness or being simply irrelevant under the circumstances, the absence of traditional indicia of coercion and S.A. Donnelly's friendly demeanor favor a determination of involuntariness. Had S.A. Donnelly arrested Conley or adopted an adversarial posture towards him, Conley would have had at least some objective reason not to rely on S.A. Donnelly's promise.

As it was, in response to Conley's stated desire to be off the record, S.A. Donnelly made his promise. S.A. Donnelly's promise to Conley at Windgap was the cause of Conley's statements at the Main Hotel. The promise overcame Conley's will to stand upon his right not to incriminate himself at Windgap and continued to have that effect at the Main Hotel.

## CONCLUSIONS OF LAW

1. Conley's statements at the Main Hotel on October 30, 1989 were not voluntary.

2. Conley's statements at the Main Hotel on October 30, 1989 must be suppressed.

## MEMORANDUM OPINION ON RECONSIDERATION

### June 27, 1994

Before the Court is the Government's Motion for Reconsideration of Order Suppressing Statement, (Document No. 878, in part).

The Government has asked the Court to reconsider its Order suppressing Defendant John F. "Duffy" Conley's October 30, 1989 statement to Special Agent John Donnelly. Upon reconsideration, the Court will alter its findings of fact, but the Order will be reaffirmed.

In prior proceedings, the Court suppressed evidence of statements made by Duffy Conley on October 30, 1989, having concluded that, under the applicable law, the statements were unconstitutionally coerced statements in violation of the Fifth Amendment. *United States v. Conley*, 859 F.Supp. 830 (W.D.Pa.1994) (Document No. 800). The Court will not reiterate its findings or legal analysis, except to the extent absolutely necessary to dispose of the Government's contentions.

The Government raises three grounds for reconsideration. First, the Government contends that Special Agent John Donnelly's ("S.A. Donnelly") off-the-record promise was limited to the Windgap "conversation." Second, the Government contends that agreeing to speak off-the-record is not a promise of use immunity. Finally, the Government contends that "Duffy Conley's testimony was given too much credibility by this Court. The defendant's version of what occurred at Windgap is at odds with the version offered by the government through FBI SA Donnelly." Government's Motion for Reconsideration of Order Suppressing Statement and Brief in Response to Defendant's Motion to Suppress "Tainted" Evidence, at 19. The Court will address the Government's contentions in reverse order.

### I

The Government does not contend that the Court's findings are not supported by the evidence. Rather, it objects that the Court believed Duffy Conley rather than S.A. Donnelly on points where their testimony conflicted, S.A. Donnelly's testimony did not cover an area, or S.A. Donnelly's testimony stated an inability to clearly recall.

 The Court, as finder of fact, is free to accept or reject any part or all of any witness's testimony. Government witnesses are not *per se* credible, or even presumed to be credible. Although many of the Court's findings were based upon the testimony of

S.A. Donnelly, the Court did in fact implicitly make credibility determinations adverse to S.A. Donnelly on critical points. As the Government has pressed the point, the Court will express its reasons—though not necessarily for every credibility determination.

██ First, the Court found to be believable the testimony of Duffy Conley in support of this motion. The Court has observed the demeanor of Duffy Conley during his testimony on this occasion and numerous other occasions. Contrary to the Government's contentions, the Court is not "unjustified" in believing Duffy Conley on critical points—whether or not it views his testimony regarding other matters as "less than candid."

Second, the Court found the testimony of S.A. Donnelly "less than candid." In its original opinion, the Court rejected S.A. Donnelly's attempt to convey the impression that the substance of *Miranda* warnings were given to Duffy Conley at the Main Hotel. *Conley*, ¶¶ 31–35 & n. 3, 859 F.Supp. 834–35. The Government contends that S.A. Donnelly's testimony "is supported by" the FD–302 prepared by S.A. Donnelly, which "represents the best evidence of what was said that day." Government's Motion for Reconsideration of Order Suppressing Statement and Brief in Response to Defendant's Motion to Suppress "Tainted" Evidence, at 19 n. 7. The FD–302 was certainly *better* evidence of what was said that day than S.A. Donnelly's testimony on direct examination. Defense counsel's cross-examination of S.A. Agent Donnelly, which was based in part on the FD–302 and in part from other sources, demonstrated the wisdom of the Framers in writing the Sixth Amendment as they did.

On cross-examination, S.A. Donnelly admitted that his purpose for the Windgap encounter, his first interview of Conley, was to obtain information about Ninny Lagatutta, Sonny Ciancutti and the Arnold Coin Company. When asked if he mentioned any of these persons at the first meeting, he "could not recall" and "didn't know that he did." Duffy Conley directly testified that S.A. Donnelly did ask about such persons at the Windgap encounter. Moreover, Duffy Conley directly testified to having discussed those persons at the Main Hotel. S.A. Donnelly "did not recall mentioning any names" at the Main Hotel, despite the FD–302's including some of the subject matters which formed the context of the discussions related by Duffy Conley, but not the names of the persons. In determining to credit Duffy Conley's testimony notwithstanding Agent Donnelly's insistence that he would not have mentioned specific names without a formal cooperation agreement, the Court had to wonder how Duffy Conley was able to discern so accurately S.A. Donnelly's actual subjective interests, which S.A. Donnelly did not recall ever expressing. *See also* (N.T. April 4, 1994 at 70–77).

The Government stresses that Duffy Conley was "uncooperative" at the first meeting. The Court believes that S.A. Donnelly was seeking a more formal cooperation agreement, but he never mentioned such an agreement to Conley. *Conley*, ¶¶ 8, 15, 859 F.Supp. at 833 (Document No. 800). The lack of a formal cooperation agreement may mean "uncooperative" in some special government sense, but the Court's findings on the demeanor of the actors during the encounters in question—based in large measure on S.A. Donnelly's testimony—reflect friendly, non-adversarial exchanges. *See id.* ¶¶ 12–16, at 833.

Based exclusively on S.A. Donnelly's testimony, the Court made the following findings:

> 2. Although there was an ongoing, independent federal investigation of John F. "Duffy" Conley ("Conley"), S.A. Donnelly was not aware of it [in mid-October, 1989]. Conley was not a target of S.A. Donnelly's investigation.

> \* \* \* \* \* \*

> 19. [At the Main Hotel] S.A. Donnelly was still conducting his independent investigation, in which Conley was not a target.

*Conley*, ¶ 2, 4 ¶ 19, at 833. S.A. Donnelly's testimony on this matter certainly was based upon a "special meaning" so narrow as to be without meaning to anyone other than the witness.

The pertinent part of S.A. Donnelly's cross-examination at the suppression hearing occurred as follows:

Q [Mr. Wymard] Agent Donnelly, you indicated that you happened to be out at The [sic] Main Hotel doing a surveillance; is that correct?

A [S.A. Donnelly] That's correct.

Q The focus of your involvement in the investigation at this time; is that correct?

A That's correct.

Q All right. and the focus of your investigation was John "Duffy" Conley, isn't that correct?

A That's incorrect.

Q That's incorrect, okay. Would you tell us what the nature of your investigation was.

A I'm not sure I can at this time because it is an ongoing investigation. But it was not—this was prior to—

Q This is 1989?

A Yes. This was prior to the matter at hand. It just so happened that my investigation overlapped with John "Duffy" Conley's video poker operation, and he was not the target of an investigation at that time.

Q Are you telling in October of 1989 John "Duffy" Conley was not the target of any FBI investigation that you were aware of at that time?

MR. WILSON: Objection, that isn't what the witness has said. And I—

MR. WYMARD: Well—

MR. WILSON: Your Honor, if I might, Agent Pietropola has indicated to me that he is aware that Agent Donnelly was participating in a surveillance directed at a target wholly unrelated to John "Duffy" Conley and not related to this—

THE COURT: He'll not be required to disclose that, but I'll overrule the objection. I think it's proper examination.

Do you understand the question?

THE WITNESS: Could you rephrase the question, please?

THE COURT: Shirley, would you please read back the last question.

(Whereupon, the previous question was read back by the reporter.)

A. He was not the target of my investigation.

Q That was not my question.

A Then I'll continue by "I am aware of." He is not the target of any investigation that I was aware of.

Q Are you telling me that you were not aware of an FBI investigation of John "Duffy" Conley on October the 30th, 1989?

A That's correct.

(N.T. July 8, 1992, at 13–15). Solely on the basis of the foregoing exchange, the Court made its Finding Nos. 2 & 19.[1]

S.A. Donnelly, Special Agent Chuck Duffy, (S.A. Duffy) and Former Supervising Agent Robert Garrity ("Garrity"), who supervised S.A. Donnelly at all relevant times, testified at the hearings on the taint, if any, arising from Conley's statements at the Main Hotel. (*See* N.T. April 4, 1994; N.T. April 14, 1994). At these hearings, it became clear to the Court that S.A. Donnelly was fully aware that the FBI was actively gathering evidence with the intention of prosecuting Duffy Conley for his activities with video poker machines. S.A. Donnelly back-pedalled from his unequivocal denial in reliance upon "special meanings" of "target" or "investigation."

At the taint hearing, S.A. Donnelly testified that he wrote his FD–302 to an existing RICO investigation file (the "RICO file"), which was not specifically a Duffy Conley file. Further, he testified that eventually an Illegal Gambling Business file (the "IGB file") was opened involving Duffy Conley as a target, and the FD–302 was subsequently incorporated into the IGB file. (N.T. April 4, 1994, at 37–38). He testified that the IGB file was opened on November 3, 1994. (N.T. April 4, 1994, at 68).

At the taint hearing, S.A. Donnelly reiterated that he was not investigating Duffy Conley at the Main Hotel, he had no knowl-

---

1. The Court's misunderstanding of the true state of affairs was evident at the outset of the April 4, 1994 taint hearing, where the Court commented, "I have the impression there is testimony in the record from the agent, I believe, that he was not aware of the IRS independent investigation." (N.T. April 4, 1994, at 6).

edge of any other FBI investigation of Duffy Conley and no knowledge of any federal investigation of Duffy Conley. (N.T. April 4, 1994, 50). He testified that he was not interested in Duffy Conley and would have no reason to want to follow him or investigate him prior to October 30, 1989. (N.T. April 4, 1994 at 98–99).

S.A. Donnelly testified that he attended at least two meetings held to adopt an enforcement strategy regarding video poker machines prior to October 30, 1994.[2] (N.T. April 4, 1994, at 113–15). One of those meetings occurred in the United States Attorney's Office, then occupied by Acting United States Attorney Charles Sheehy. In addition to S.A. Donnelly and Mr. Sheehy, Garrity, S.A. Duffy, First Assistant U.S. Attorney Craig McKay and Pennsylvania State Troopers Cunningham and Aaronson were present. (N.T. April 4, 1994, at 116). The meeting was called to introduce the members of the law enforcement groups to each other and to the Acting United States Attorney's plan to implement a recent federal court decision, *United States v. 294 Various Gambling Devices*, 718 F.Supp. 1236 (W.D.Pa.1989) (Weber, J.), regarding the legality of video poker machines. (N.T. April 4, 1994, at 116–17). Targets of the joint task force were identified by name. (N.T. April 4, 1994, at 117). Regarding the targets, S.A. Donnelly testified as follows:

> Q [MR. WYMARD] You don't know whether any specific targets were mentioned, but potential targets were mentioned? Is that what you are saying?
>
> A [S.A. DONNELLY] Yes.
>
> Q Can you tell us who the potential targets were that would have been mentioned?
>
> A. Three Rivers Coin, Haubelt Vending, Arnold Coin; those three that come to mind.
>
> Q Three Rivers Coin?
>
> A Yes.
>
> Q Haubelt Vending?
>
> A Yes.
>
> Q And what else?
>
> A Arnold Coin.
>
> Q These were three potential targets. Is that correct?
>
> A Yes.
>
> Q All right. Was the name "Duffy" Conley mentioned?
>
> A I would say, I guess, yes, sir.
>
> Q It was?
>
> A Yes.
>
> * * * * * *
>
> Q Was his name mentioned? Was "Duffy" Conley mentioned at this meeting?
>
> A Yes.
>
> Q It was?
>
> A Yes.
>
> Q As a potential target?
>
> A Three Rivers Coin.
>
> Q That is not what I asked you. I asked you if the specific name, "Duffy" Conley, was mentioned as a potential target.
>
> A You have added something to that sentence from the first time. You asked, was he named as a target? He was named in that he was the operator of Three Rivers Coin. Three Rivers Coin, a company, was targeted. And not individuals. A company. And in the historical background of who makes up the company, John "Duffy" Conley's—in all probability—his name was mentioned.
>
> Q As the owner and operator of Three Rivers Coin?
>
> A Yes. With Bill Curtin and others.
>
> Q Give me your best guess of when this meeting occurred.
>
> A I couldn't even begin to give it.
>
> Q It was late October? Is that what you are saying—
>
> A No.
>
> Q —in your report?
>
> A No. I believe this one was early on.

(N.T. April 4, 1994, at 117–19). Further, S.A. Donnelly testified that he specifically remembered "the strategy meeting in the office of Chuck Sheehy, when they said 'Go get him.'" (N.T. April 4, 1994, at 125).

---

**2.** From S.A. Donnelly's testimony it is not clear whether these meetings preceded mid-October, 1989. The Court infers from the testimony of others, however, that they did.

Nevertheless, S.A. Donnelly insists, "As of the 3rd of November, John 'Duffy' Conley became a target of an illegal gambling business." (N.T. April 4, 1994, at 127).

In contrast, S.A. Duffy testified that the decision to include Duffy Conley as a target of the joint gambling investigation had been made months before November 3, 1989, as early as September 1989. (N.T. April 4, 1989, at 174, 187). There was a gathering of intelligence going on before the formal opening of a file, which he testified was "just a technical matter of putting something in writing in order to get it started." (N.T. April 4, 1994, at 174). It came out very early in the meetings of the joint task force that Duffy Conley was probably the largest video poker machine operator in Western Pennsylvania. (N.T. April 4, 1994 at 176). By mid-October, S.A. Duffy definitely considered Duffy Conley a target. (N.T. April 4, 1994 at 200–02).

Former Supervising Agent Garrity testified that as a result of the meetings following Judge Weber's decision, the FBI had reason to believe that Duffy Conley and Curtin were under the direction of Ninny Lagatutta, and Duffy Conley was known to have had a significant number of video poker machines in operation. (N.T. April 14, 1994, at 11–12). He testified that on October 30th S.A. Donnelly definitely was a key part of the federal investigative team looking into video poker machine gambling. The following exchange then occurred:

Q Okay. So then when he [Donnelly] would—let me ask you this. He has told us that on October 30, 1989 when he took this statement from Duffy Conley at the Main Hotel, that to his knowledge, as having been a special agent working for you, okay, and the FBI in this video poker area, that John Duffy Conley was not the target of any federal investigation on October 30th, 1989. Would you agree with that?

A He said that?

Q That's what he said.

A I guess it all goes back to what—you know, maybe his interpretation of what a target was. He certainly was one of the people we talked about, so I considered him part of the—what I considered at that time to be part of the illegal poker machine business in the Pittsburgh area, Allegheny County, and so, you know, if he didn't consider him a target, I can't answer that.

Q Okay. Well, that's what his testimony was. And he was unaware of any federal investigation that involved John Duffy Conley on October 30th, 1989?

A *That's probably hair splitting. I mean, maybe there was no official memorandum opening a file but there was investigation to the extent that we had discussed his activities in this area.*

(N.T. April 14, 1994, at 31) (emphasis added). Garrity was also aware that the FBI was investigating Sonny Ciancutti's involvement in video poker machine gambling, and the investigation was assigned to S.A. Donnelly. (N.T. April 14, 1994, at 32). He was also aware the FBI was investigating Ninny Lagatutta's involvement with video poker machines, but indicated that the FBI had not yet sorted out the relationships involved among the operators. (N.T. April 14, 1994, at 34–36).

■ Based upon the foregoing, and the record developed on July 8, 1992, April 4, 1994 and April 14, 1994, the Court substitutes the following findings of fact for Finding No. 2 in *Conley,* ¶ 2, 859 F.Supp. at 833 (Document No. 800):

2.(a) S.A. Donnelly was fully aware that the FBI was actively gathering evidence with the intention of prosecuting Duffy Conley for his activities with video poker machines, and he was an important member of the video poker gambling task-force at all relevant times.

(b) No memorandum opening a formal, funded investigation pursuant to FBI procedures specifically named Duffy Conley in the caption of the memorandum.

(c) S.A. Donnelly was gathering evidence and information regarding Duffy Conley in connection with the investigation of Sonny Ciancutti and the broader joint task force investigation of video poker machine gambling. The evidence was being gathered because, although he was not yet named in any opening memorandum, Duffy

Conley had become a potential defendant in both of the investigations.

In addition, based upon the foregoing, and the record developed on July 8, 1992, April 4, 1994 and April 14, 1994, the Court substitutes the following findings of fact regarding the encounter at the Main Hotel for Finding No. 19 in *Conley*, ¶ 2, at 833 (Document No. 800):

19.(a) S.A. Donnelly went to the Main Hotel for the purpose of making contact with Duffy Conley.[3]

(b) S.A. Donnelly intended to elicit evidence regarding Duffy Conley's involvement in video poker gambling from Duffy Conley at the Main Hotel.

(c) S.A. Donnelly's presence at the Main Hotel on October 30, 1989 was causally related to statements made by Duffy Conley at Windgap in mid-October in that S.A. Donnelly had uncovered contrary information and sought to asked Duffy Conley about the contradiction.[4]

The Government has pressed the credibility of S.A. Donnelly regarding the events surrounding Duffy Conley's statement at the Main Hotel. In short, the Government's credibility ground for reconsideration is without merit.

## II

The Government's second ground for reconsideration is that the Court erroneously held that S.A. Donnelly promised Duffy Conley informal use immunity without limitation as to time. The Government misapprehended the Court's Opinion.

The Court clearly held that "Conley's statements at the Main Hotel on October 30, 1989 were not voluntary." *Conley*, at 840, Conclusion of Law No. 1 (Document No. 800). The Court's only reference to 18 U.S.C. § 6002 was a passing one in footnote 6. Footnote 6 was addressed to language from *United States v. Fraction*, 795 F.2d 12, 15 (3d Cir.1986), which may be read as requiring a promise to be properly authorized before a statement can be suppressed on the basis of the promise. The Court never indicated that anyone other than a prosecutor could grant informal use immunity. The Court only found a similarity between the manner in which society's interest in prosecuting informants should be protected, that is, by regulating the making of promises to informants in the first place, not in failing to somehow give already made promises effect. Footnote 6 concludes, "In short, it is the making of the promise in this case that is relevant to the voluntariness inquiry, rather than the question of whether the promise was, or should be, within the lawful authority of S.A. Donnelly." *Conley*, 859 F.Supp. 839. In contrast, the inquiry in the cases cited regarding informal use immunity, which are cited nowhere else in the Opinion, is focused upon the enforceability of prosecutor's promises, not voluntariness. *See, e.g., Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427 (1971).

The Court's supplemental findings in I.A. above resolves the Government's argument's

---

3. S.A. Donnelly went to the Main Hotel as part of an investigation into video poker gambling. S.A. Donnelly knew—but not "positively"—that the video poker machines on the premises belonged to Conley. S.A. Donnelly was not investigating the owner of the premises, Anthony Gangone. Upon seeing Duffy Conley, S.A. Donnelly publicly identified himself and S.A. Moriarity as FBI agents. When Conley left to run an errand, the agents left the hotel, returning to the hotel when Conley returned. Upon conclusion of their encounter with Conley, the agents immediately left the hotel, and S.A. Donnelly returned to his office to write his report. The FD–302 makes no reference to failure of the original object of the "surveillance," though the FD–302 was written, not to a Duffy Conley file, but to pre-existing RICO file.

4. S.A. Donnelly testified about his questions of Conley during the first meeting at Windgap:

A: What was his business dealings with other companies in Western Pennsylvania.
Q: Okay.
A: And that was about as far as it went. He indicated there was an—he was an independent operator, acting solely on his own, and at the subsequent meeting I had uncovered information obtained from Arnold Coin that he was, in fact, doing business with Arnold Coin, *which precipitated my interview of him,* saying: "Now, I know you have done business with Arnold Coin. Tell me about Arnold Coin."
(N.T. July 8, 1992, at 53) (emphasis added).

predicated on S.A. Donnelly's lack of awareness of any federal investigation targeting Duffy Conley. Moreover, the Government's argument regarding S.A. Donnelly's understanding of intending not to use Conley's statements against him are not only "nothing more than speculation," *United States v. Walton*, 10 F.3d 1024, 1029 (3d Cir.1993), they are contradicted by the record. *See Conley*, ¶ 7, 859 F.Supp. at 833.

### III

The Government's primary argument is its first argument, which the Court is addressing last. The Government's argument is predicated in part upon succeeding in persuading the Court that it erred in failing to credit S.A. Donnelly's testimony, in part upon Duffy Conley's statements at his November 3, 1989 state-court preliminary hearing, in part upon the baseless contention that the Court applied an outdated legal standard, and in part upon playing semantics and ignoring the totality of the circumstances. The Court rejects the Government's argument.

■ The Court did not err in failing to credit the in-court testimony S.A. Donnelly. Moreover, the Government has introduced only hearsay evidence of the statements attributed to Duffy Conley at his state-court preliminary hearing. The Government introduced a November 8, 1989 memorandum to the IGB file (opened on November 3, 1989) in which S.A. Donnelly writes that Duffy Conley acknowledged that S.A. Donnelly gave him sufficient warning at the Main Hotel to "avoid conversation" or "to cease at any time." Had S.A. Donnelly testified regarding such statements, Duffy Conley's statements would not, of course, be hearsay. The Government only introduced the memorandum, and it is crystal-clear that S.A. Donnelly was not subject to cross-examination on the memorandum.[5] Recognizing the relevance of the hearsay statements regarding

Duffy Conley's statements at his November 3, 1989 state-court preliminary hearing contained in the November 8, 1989 memorandum, which the Court has admitted in evidence, the Court declines to give the hearsay any weight.

The Court relied upon current law, including *United States v. Walton*, 10 F.3d 1024 (3d Cir.1993), in analyzing the voluntariness of Duffy Conley's statements in light of S.A. Donnelly's promise. Under the totality of the circumstances, the Court appropriately found that S.A. Donnelly's statements—that Conley was not a target of his investigation and that they could speak "off-the-record," (the two having reached the proverbial subjective "meeting-of-the-minds" that this meant Conley's statements would not be used against him)—maintained their "uniquely influential nature," *id.* at 1030, and were the cause of Conley's statements at the Main Hotel.[6]

The Court will not redo its totality of the circumstances analysis here. It will indicate that S.A. Donnelly's investigative interest in Conley and knowledge that at all relevant times Conley was a "target" of his "investigation," as those words are generally understood, certainly casts S.A. Donnelly's October 1989 conduct in a more deceptive and manipulative light. Initially, upon reading *Walton*, the Court saw a potential ground of distinction in that Walton had been identified by law enforcement officers as a suspect, whereas S.A. Donnelly considered Conley merely a potential informant. Upon reconsideration, that distinction has been removed.

The Government's Motion for Reconsideration of Order Suppressing Statement, (Document No 878, in part), will be denied.

---

**5.** On July 8, 1992, S.A. Donnelly testified regarding certain events at the November 3, 1989 preliminary hearing, and was subject to cross-examination on that testimony. *Cf. Conley*, slip op. at 5–6 & n. 3, —— F.Supp. at ——. As S.A. Donnelly denied preparing a "report" of his attendance at the preliminary hearing, (N.T. July 8, 1992, at 64–65) and the Government did not introduce S.A. Donnelly's "memorandum" through him, S.A. Donnelly is an uncross-examined hearsay

declarant regarding the November 8, 1989 "memorandum."

**6.** The Government cites *Walton* as indicating that a defendant must reasonably perceive the government promise. Because in *Walton* and in this case such perception was reasonable, neither case decides that issue. *See Walton*, 10 F.3d at 1029.