**UNITED STATES of America,**

v.

**Kerry DEMINGS, Defendant.**

**Criminal No. 09–298 (KSH).**

United States District Court, D. New Jersey.

May 19, 2011.

---

Zach Intrater, United States Attorney's Office, Newark, NJ, for United States of America.

## *OPINION*

KATHARINE S. HAYDEN, District Judge.

'However much in a particular case insistence upon such rules may appear as a technicality that inures to the benefit of a guilty person, the history of the criminal law proves that tolerance of shortcut methods in law enforcement impairs its enduring effectiveness.'

—*Mapp v. Ohio*, 367 U.S. 643, 658, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (quoting *Miller v. United States*, 357 U.S. 301, 313, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958)).

Kerry Demings was arrested within a few minutes of being spotted sitting behind the wheel in his car on a winter evening, talking through the front passenger window to a couple of young men standing on the curb. The location was outside a bodega on a well-lighted street corner in Newark. The young men were neither questioned nor arrested, and there was no indication that the police suspected narcotics activity was underway. Instead, two police vehicles interrupted their drive through the city streets to investigate Demings and ultimately search his car because, as the officers testified, his car was angled too far into the street and possibly could obstruct a car that might drive by.

The police found a gun and ammunition in a gun case in the back seat area of the car, along with a bag of marijuana. The government is now prosecuting Demings, who has a record, as a felon in possession of a weapon under 18 U.S.C. § 922(g)(1). Demings has moved to suppress the gun and the ammunition. The Court held a hearing at which two officers testified for the government and Demings testified on his own behalf. Each side was well represented and the cross-examination was vigorous.

In the end, the Court is left with the firm conviction that the police officers' testimony was not credible, and that Demings

told the truth when he described his encounter with them. Accepting Demings' facts, his Fourth Amendment right "to be secure in [his] person ... and effects, against unreasonable searches and seizures" was violated and the items seized are inadmissible against him. This is not a conclusion reached with much joy. Newark is a troubled city, the police unquestionably face a difficult job, and Demings himself did not try to minimize his culpability in possessing this contraband. But in a case like this, where the police initiated the encounter and their testimony did not establish that either a citizen or police officer was threatened or that criminal activity was afoot, the Court does not confront the vicissitudes of a fast-moving scenario fraught with potential danger. Instead, the Court considers the quieter, but still disquieting question of how much is left of the Fourth Amendment during "a brief encounter between a citizen and a police officer on a public street," when that street is in the city of Newark. *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Enough, as the Court finds below, to grant Demings' motion.

**Facts:** [1]

The Fifth Precinct of the Newark Police Department covers the South Ward of the city. On the evening of February 3, 2009, Lt. Neil Minovich, then [2] Commander of the Fifth Precinct's Narcotic Enforcement Team, began the 7 pm to 3 am shift with a briefing. (Tr.1 6:8–11.) The Narcotic Enforcement Team is a street-level narcotic unit assigned to investigate and handle street-level narcotic activity. The Team is staffed with up to 10 officers. (Tr.1 5:19–21.) That night the briefing focused on locations with high incidence of narcotics activities. (Tr.1 6:12–16.) After concluding the briefing, Minovich and his officers "pretty much saddled up," which means "we get into our cars and we go on patrol checking these locations." (Tr.1 6:21–22.)

That evening, the officers used two unmarked cars, a white Ford Explorer, which Minovich drove with two other officers, and a blue Chevy Caprice carrying three officers. All of the participants wore plain clothes. Minovich was in charge: "I'm the lead vehicle and I'm the boss, and I pretty much direct them to [the] locations we're to check in the evening." (Tr.1 8:1–3.) The cars proceeded slowly so the officers could observe "things that are out of the ordinary, that we believe are out of the ordinary." (Tr.1 8:1–12.) The weather was cold with icy road conditions. (Tr.1 8:22–24.)

Sometime before 8:20 pm, the police cars were traveling east on Nye Avenue, a two-way street with single-lane traffic. (Tr.1 9:6–8.) Minovich testified that as he drove along Nye and approached the intersection of Nye and Wainwright Street, a one-way street going north, "my attention was drawn to a car [on Wainwright] that was improperly parked ... a beige Ford Taurus." (Tr.1 13:4–11.) The Taurus was on the right side of Wainwright pointed north, facing the intersection with Nye. (Tr.1 38:17–23.) Minovich testified that the Taurus was past the stop line but behind the crosswalk line, with its back end three or four feet from the curb and its front end protruding out further into

---

**1.** There are two transcripts from the October 14 hearing. The first contains the testimony of Lt. Neil Minovich, and the second includes the testimony of Demings and Officer Neil Laurie. The Court will refer to the transcripts as "Tr.1" and "Tr.2."

**2.** When he testified at the suppression hearing, Minovich indicated that he was retiring: "[G]ot about 12 more days and I'm done." (Suppression Hr'g Tr., October 14, 2009 ("Tr.1") at 4:14.)

the street. Based on his training and experience, Minovich determined that, if cars were parked across the street, then a car traveling north on Wainwright approaching the stop sign at the intersection with Nye would not be able to stay in the lane of traffic without hitting the nose of the Taurus. (Tr.1 15:3–7, 38:17–23 and 43:7–44:9.)

The intersection was lit with "plenty of light" from a street light and from a bodega on the southeast corner, which had lights underneath the awning and lighted windows that also illuminated the corner. (Tr.1 15:14–18.) Minovich testified that, from the driver's seat of the lead car, he could see into the Taurus, which had one occupant, the driver, whom he identified as Demings. The car was running. The officers stopped "to address the motor vehicle violation." (Tr.1 17:12–25.) When Minovich first observed Demings, he appeared to be speaking through the passenger-side window with two young males standing on the corner close to the curb. (Tr.1 20:3–6.)

Minovich turned the Explorer onto Wainwright (going in the wrong direction to do so) and pulled alongside Demings' car. He testified that there was space so that if Demings had wanted to, he could have driven around the Explorer. (Tr.1 14:7–8.) The Caprice followed the Explorer onto Wainwright. Minovich testified that he "pulled in front of [Demings'] vehicle [to] allow him to have room to leave if he needed to. At that time Officer [Neil Laurie, sitting next to Minovich] had activated our emergency siren to alert him that we were the police, and we really wanted him just to park the car properly." (Tr.1 20:7–11.)

According to Minovich, Laurie had the window down and directed Demings to park his car. When the siren made its loud chirp, Minovich testified, Demings "sat straight up and as he looked at us he began to move with his hands towards his lap ... where I couldn't see." (Tr.1 21:4–7.) Demings "appeared to be nervous. He was startled ... [s]urprised to see us. You know. That—that time, like I said, he was moving his hands quickly towards his lap area. That time we decided to exit our vehicle to investigate." (Tr.1 21:13, 16–19.) Asked to describe exactly what he meant when he said that Deming "dropped his hands and was moving them," Minovich replied: "Like he was—looked like he was, I'm—just a conjecture, you know, just that he was moving like he was attempting to cover something, to hide something." (Tr.1 21:23–25.)

Minovich testified that he told Demings to move his car, and then Laurie said "[S]omething, something ain't right here, that's when we began to exit the car." (Tr.1 22:3–7.)

Q: Now, did you think anything of the defendant's actions at that point?
A: I felt it to be a little suspicious. Usually when you direct someone to move their car, you know, they right away, yes, officer, and they put their car in gear or they'll try to get out of the car and explain that, you know, my car's broken down and I'm waiting for somebody. But that wasn't—that wasn't done." (Tr.1 22:8–15.)

Minovich exited his car with his flashlight and, keeping his eye on Demings, walked around the front of Demings' car to the passenger side. (Tr.1 22:20–22, 24:19–21.) He testified that he saw Demings move an object from the front seat on the passenger's side over to the back seat. (Tr.1 22:21–23:1.) He described the object as a hard, square black box. (Tr.1 23:19–25.) While this was happening, the other officers quickly bore down on Demings' car. Minovich testified that as he was walking towards the car, Laurie "was shouting to [Demings], 'Let me see your

hands, let me see your hands. Show us your hands.' Like that, as I continued to walk." (Tr.1 25:21–25.) Minovich testified that he likely told the young men on the corner who had been talking to Demings to "stand back, fellows," and he shone his flashlight into the front passenger area of the car. (Tr.1 26:6–10.) There was nothing on the front passenger's seat. (Tr.1 26:16–17.)

Minovich testified that "at that time, Laurie and the other officers had converged on the driver [who] had his head into the steering wheel saying, 'I don't believe this. I don't believe this.'" (Tr.1 26:19–22.) Minovich was proceeding to the rear passenger door because "I wanted to see—just what he put behind" the seat. (Tr.1 27:1–2.) "He was hiding something, attempting to conceal something." (Tr.1 27:6–7.) Minovich's flashlight illuminated the floor of the back seat on the passenger's side. He testified that he saw the black box situated so that it was on its edge on the floor, open; sticking out was a clear plastic bag with a "green[ish] vegetative substance." (Tr.1 27:11–16.) Minovich announced to the other officers that "we got some weed back here," and they ordered Demings out of his car. (Tr.1 27:16–18.)

Minovich testified that once he spotted the bag he knew, based on thousands of arrests, that it contained marijuana, and he then grabbed the black box and, because of its weight, inspected it further, placing it on the back hood of the car and observing a black pistol inside. (Tr.1 29:4–22.) He alerted his officers with the street term "Roscoe" (meaning "we got a gun here") and "they all collapsed on the defendant, securing him ... and conducting a thorough patdown." (Tr.1 29:20–25.) Demings was handcuffed.

On cross-examination regarding his initial encounter with Demings, Minovich tes-tified that "the whole reason we sounded our siren [was] to let him know the police are here, park the car properly." (Tr.1 45:23–46:1.) In a series of questions, Minovich stated that he and Laurie alternatively ordered Demings to park the car or move the car:

He was directed by Police Officer Laurie, you know, that we were the police, park your car, right. . . .

Q: But you didn't tell him to move [his] car. Correct?

A: Me no. I didn't tell him to move the car.

Q: Officer Laurie didn't say, quote, "move your car"?

A: He said, "Police, move your car—police, move your car."

Q: He said, "Police, move your car," or "park your car"?

A: Told him to move the car. (Tr.1 46:1–46:11.)

Had Demings immediately driven past when the police stopped and chirped the siren, Minovich testified, then there would have been "no problem." (Tr.1 46:14–17.) In response to defense counsel's question about the presence of other items in the car, specifically a backpack, Minovich denied seeing one, and said he did not search Demings' car and did not recall if anyone else did. (Tr. 47:11–22.)

Demings testified. He stated he was driving his wife's car, and had stopped at the corner bodega to buy cigars. (Tr. Suppression Hr'g, October 14, 2009 ("Tr.2") at 3:23–4:1–11.) When he came out, he started the car, put on his seat belt, and began pulling away from the curb, and "that's when the officers pulled out and they stated to inquire: What are you doing, you look suspicious[.]" (Tr.2 4:22–5:3.) In response to shouts from the driver of the Caprice to "Cut the car off. Cut the car off. Cut the car off," Demings re-

versed, parked and shut off the car. (Tr.2 9:12–20.) At that point, Demings stated, the police cars swung around so the Ford Explorer was beside him, facing in the wrong direction, and the Caprice was directly in front of his car blocking him in. (Tr.2 8:10–13, 9:20–22, 10:17.) Demings testified that Minovich approached him, asking for his license and registration, and as Demings began answering Minovich, another officer went around the car. (Tr.2 10:17–21.) According to Demings, Minovich ordered Demings out of the car while officers looked inside it and, once Deming was out of the car, the officers took a gray book bag or backpack that was on the floor of the back seat, placed it on the trunk, and started unzipping its various compartments. (Tr.2 10:21–25.)[3]

Demings, cuffed by that point, said that he blacked out and sank to the ground ("Because I knew what was in the book bag"). (Tr.2 30:18–20.) Demings testified that he quickly came to, got back on his feet, and saw the officer pulling the black case out of the backpack. They had difficulty opening it because the case does not just flip open—"you have to like move it and use a little muscle to open the case." (Tr.2 11:9–13.) Demings described the backpack as having different zippered compartments, one of which contained the marijuana and another which contained the black case. (Tr.2 11:20–24.) He testified that the police left the backpack in the car after they arrested him and drove him to the police precinct in one of their cars. (Tr.2 14:7–16.) The police left the Taurus where Demings had parked it. (Tr.2 13:12–13.) Demings produced a backpack in the course of his testimony, indicating that it was recovered by his family when they picked up the Taurus.

In rebuttal, the government called Laurie, who testified that while he was driving with Minovich heading east on Nye venue, he saw Demings' Taurus blocking the flow of traffic on Wainwright because its front end was protruding. (Tr.2 45:3–17.) Demings was in the driver's seat, the car was stopped, and, from the angle of Demings' body, it appeared that he was conversing with individuals standing on the sidewalk. (Tr.2 46:7–8.) Laurie testified that the officers "decided to pull up and advise him to park the vehicle." (Tr.2 46:19–20.) "Once we pulled up, I sounded my siren. I yelled out 'park your vehicle.'" (Tr.2 46:22–23.) Laurie said that he walked up to the driver's window with the intention of seeing Demings' license and registration, while Minovich walked around the car toward the rear of the passenger's side, and then yelled, "we got weed." (Tr.2 48:11–18.) Laurie was among the officers who arrested Demings, and denied that Demings lost consciousness at any time. (Tr.2 49:14–19.)

On cross-examination, Laurie testified that he decided to get out of the police car because "we asked Mr. Demings to park his vehicle, move his vehicle, and he disregarded that." (Tr.2 52:11–13.) It was then, as the officers were getting out of their car, that Demings failed to move his car and began making suspicious movements. (Tr.2 52:18–20.) According to Laurie, Demings started "reaching for his waist area. That's what made us exit our vehicle. Once I exited my vehicle, that's when I saw him reach over to the passenger side." (Tr.2 56:15–18.)

Laurie denied that a police car blocked Demings from going forward, but he could not say where the second police vehicle,

---

**3.** Demings alternatively referred to the item as a book bag or a backpack. The Court will use the latter term.

the Caprice, was located during the incident. (Tr.2 56:19–22.) Asked about his testimony on direct that he advised Demings to park as opposed to moving his car, Laurie answered that, "I figured he was conversing with the two people on the sidewalk. He meant to stop, he meant to be there." (Tr.2 55:23–24.) He testified that Demings' car was running and behind the stop sign, but Laurie could not recall whether the lights were on. (Tr.2 54:2–3.) Laurie also testified that he and Minovich pulled alongside Demings because his car was stopped in a manner that was hazardous due to the icy conditions that night. (Tr.2 54:7–12.) There was room for a car driving north on Wainwright to get around Demings' car, "but because of the ice it was definitely hazardous." (Tr.2 58:13–23.) Laurie testified that there was no discussion between him and Minovich about swinging around onto Wainwright; rather, once they observed the "hazardous conditions," "we knew that we had to tell [him] to park." (Tr.2 59:21–60:2.) Questioned further, Laurie stated that at the time when the officers first saw Demings' car, it was jutting out far enough onto Wainwright Street that another car would have to go slowly to pass by it, "but because of the ice, we didn't want an accident." (Tr.2 60:15–18.) Laurie admitted that the officers only observed Demings for "about two seconds" before they pulled up and he ordered Demings to park (or move) his car. (Tr.2 55:3–7 and 61:16–18.) Six officers were involved in the incident. (Tr.2 61:22–25) Laurie was not sure if the other officers "did anything with" the individuals on the sidewalk who were conversing with Demings, and he did not know their names. (Tr.2 57:23–25.) Another officer, Sgt. S. Powell, later issued a traffic ticket citing Demings for "improper parking." (Gov't Ex. 5.)

**Discussion:**

A defendant may move to suppress evidence in the court where trial will occur. Fed.R.Crim.P. 41(h). "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (citing *Simmons v. United States,* 390 U.S. 377, 389–390, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). Although the burden of proof in a suppression motion generally falls on the defendant, in the case of a warrantless search, "the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson,* 63 F.3d 242, 245 (3d Cir.1995) (citing *United States v. McKneely,* 6 F.3d 1447, 1453 (10th Cir.1993)).

■■■ In deciding a motion to suppress evidence, the trial court determines the credibility of witnesses. *United States v. Davis,* 514 F.2d 1085, 1088 (7th Cir.1975) (quoting *United States v. Conner,* 478 F.2d 1320, 1323 (7th Cir.1973)). As the finder of fact, the court can accept or reject any or all of a witness's testimony. *United States v. Murphy,* 402 F.Supp.2d 561, 569–70 (W.D.Pa.2005) (citing *United States v. Conley,* 859 F.Supp. 830 (W.D.Pa.1994)). Credibility determinations "are to be made in consideration of numerous factors, including ... the witness's ability to accurately recollect the matters at hand [and] ultimately, the extent to which [the testimony] withstands a common sense test of reason and logic." *Id.* The credibility of a defendant who testifies on his own behalf should be "judged in the same way as any other witness," and, likewise, a witness should "not to be judged more or less credible because the witness is a law enforcement officer." *Id.* (citations omitted).

■ Here, the government challenges Demings' testimony as not credible, and defends the officers' testimony as credibly establishing that they had constitutional grounds for searching the car and recovering the weapon under *Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Wardlow was arrested by uniformed police who were driving in the fourth car of a caravan cruising through a high crime area of Chicago in order to investigate drug transactions. He had been standing by a building, holding an opaque bag. Wardlow looked in the direction of the police cars, turned, and fled. The arresting officers followed Wardlow and eventually cornered him, patted him down, and found a weapon. The Illinois appellate courts ruled that the police conduct violated Wardlow's Fourth Amendment rights, with the Illinois Supreme court specifically holding that sudden flight in a high crime area did not supply reasonable suspicion for a *Terry* stop, citing to the familiar case of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The Supreme Court reviewed the teaching in *Terry* that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Id.* at 123, 120 S.Ct. 673, citing *Terry* at 30, 88 S.Ct. 1868. Describing the facts in *Wardlow* as involving "a brief encounter between a citizen and a police officer on a public street," the Court held that Wardlow's "unprovoked flight upon noticing the police," coupled with his "presence in an area of expected criminal activity," was sufficient to provide "a reasonable, particularized suspicion" that Wardlow was committing a crime. *Wardlow* at 124–26, 120 S.Ct. 673. The Court granted certiorari "solely on the question whether the initial stop was supported by reasonable suspicion." *Id.* at 124 fn. 2, 120 S.Ct. 673.

The facts here are distinguishable from the facts in *Wardlow.* To begin with, the officers made the decision to pull alongside Demings' car—and essentially hem it in—after observing the car for no more than a few seconds. (Tr.2 55:6–7). The entire incident took about a minute and a half. (Tr.2 56:10–12.) There was no testimony that the corner of Wainwright and Nye Avenues at 8:20 pm—an area illuminated by both a streetlight and a lit-up bodega open for business—constituted a high crime area. There was no testimony that Demings was engaged in criminal activity with the two individuals who were standing on the street corner and whose names the police did not take down. Nor was there any testimony that Demings attempted to flee.

But the real problem with the *Wardlow* analysis is that it requires the Court to accept the police version of events when, in the final analysis, Demings' version is more plausible. The police testified about Demings' "strange and disconcerting" behavior. But when subjected to close scrutiny, how credible is this testimony about how Deming's acted? Both officers' "hand-movements-at-his-waist" testimony is inconsistent with their other testimony that Demings was engaged in a conversation through the passenger's side front window, with his body twisted around for that purpose. Minovich made much of a hand movement he attributed to Demings where Demings purportedly took an object from the front seat and put it, as Minovich stated, "boom" over into the back seat area. Based on his brief observation of that activity, Minovich testified that he shone a flashlight into the case and found that Demings had positioned the black case so awkwardly on the floor that marijuana spilled out, giving him grounds for

yelling "We got weed!" and reaching into the car to seize the case.

In contrast, Demings testified that Minovich's Explorer pulled alongside his car, and that the Caprice blocked him in front. Minovich got out and approached the driver's side window and questioned him about his license and registration, and then ordered him out of the car. At the same time, another officer shone a flashlight into the car and pulled out a backpack. The backpack Demings described was introduced as a defense exhibit. Demings testified that when he saw the backpack in the hands of the police, who had placed it on the trunk of the car and were unzipping it, he sank to his knees on the slushy street and blacked out because he knew what they were going to find.

The testifying officers denied that Demings blacked out, and denied that there was any backpack at all. They claimed they did not search the car, but rather took Demings into custody, placed him in one of the police vehicles, and drove him to the precinct for booking. They left the car behind, and later another officer issued a ticket for improper parking. The parking citation strikes the Court as an awkward after-thought given police testimony that they left room for Demings to pull away had he chosen to; that in one of the iterations of events they actually ordered him to park the car; and that the Taurus motor was running when they encountered him. In short, the police who were on the scene never testified that Demings illegally parked the car before they took him into custody, but Demings was cited nevertheless.

Of the two versions of what happened when Demings was ordered out of the car, Demings' is more credible. It is hard to believe Demings would have invented a blackout, particularly in this context, where such a reaction supplies evidence of guilt. And there is the ring of truth when Demings said, "[M]y whole foundation was shaking at that moment. I knew what was in the [backpack], and ... when the officer pulled out the [backpack] and put it on the trunk of the car, that's when I got weak and I kind of lost it." (Tr.2 32:1–5.)

Minovich's and Laurie's description of the street as impassable given the location of Demings' car is contradicted by their other testimony that, had Demings wanted to, he could have pulled around the police cars and moved along, and that a car driving slowly north on Wainwright could have passed the Taurus. Laurie could not say where the Caprice was located, and Minovich indicated the Caprice was following his car, lending credibility to Demings' testimony that the Caprice was blocking his car and so that he could not have chosen to move along. The police testimony that, after finding a gun and marijuana and placing Demings in their car, they searched no further for other guns or contraband and simply drove away from the Taurus is dubious; but that testimony does make sense if they had *already* searched the car and found contraband, as Demings said they had. Demings introduced the backpack into evidence and demonstrated that the gun case could fit inside the larger compartment and the packets of marijuana could fit inside the smaller zippered pockets. The police version, in denying that there was a backpack, asks the Court to believe that Demings was engaged in conversation with young men standing outside the car on the passenger side, while on the front seat a hard black case containing a gun and marijuana was either lying open or in a partially open position. Notwithstanding that, and even with six officers present, the young men were never questioned, nor did either officer testify that he was alerted to a narcotics transaction in progress; in fact, accord-

ing to Minovich, these unnamed young men—potential witnesses in a gun and drug possession prosecution, or perhaps worse—were politely invited to step aside.

Minovich testified about the practice of "proactive patrols" that he and his men engaged in as they searched for people committing crimes. (Tr.1 34:10–35:8.) About this, there is no reason to doubt him because the testimony supports highly proactive conduct. The instantaneous and unspoken decision to, upon spotting the Taurus, pull up and immediately approach, happened, according to Minovich, "like this (snapping fingers) very fast." (Tr.1 45:18–20.) Within seconds of seeing Demings' car, Minovich led his unit the wrong way down a one-way, icy street at night and pulled beside the Taurus. And after seconds of observation, Minovich acted on an admitted "conjecture" and walked around the Taurus, shining his flashlight into it.

Having admitted to a "conjecture," the Court finds that Minovich, and Laurie as well, sought to buttress that "conjecture" by embellishing their testimony with details about suspicious hand movements that frankly make no sense and lack the ring of truth. Nor does the strained description of a hard-sided gun case angled in such a way that marijuana could be seen spilling out of it. The police version skirts or omits key points in Demings' testimony: that he was ordered out of the car; that the police swarmed the car and searched it; that they found the backpack and looked in it; that Demings was handcuffed while this was going on; and that, overwhelmed, he blacked out when he saw the police had recovered the backpack and would inevitably find the gun inside the gun case and the drugs in the zippered pockets. When Demings testified about this, his demeanor was such that the narrative was very believable. His testimony that the police worked rapid-fire, emitting loud "chirps" from the police car and bark-ing orders, is consistent with Minovich's description of the police as saddled up and out on patrol. Both officers failed to make a distinction between their purported commands to Demings to "park" or "move," and his ability to move at all is seriously in doubt from the testimony they gave about the position of their cars (which did not stop another Newark police officer from issuing a ticket citing Demings for illegal parking). This incoherent report about what they expected from Demings is less believable than Demings' testimony that he was surrounded on two sides by police cars; that Minovich got out of one of them and approached him on the driver's side, questioned him, ordered him out of the car; and that other police officers searched the car and found the backpack and proceeded to open it while he slumped to the ground. The Court accepts Demings' testimony as a more plausible account of the encounter, albeit an account that cannot be harmonized with Demings' constitutional right to be free of unreasonable search and seizure.

**Conclusion:**

Minovich's and Laurie's version of events is internally inconsistent, illogical, and, in parts, simply not credible. To justify what turned out to be a good guess—in a matter of seconds, Minovich and Laurie made a great guess—these officers wrapped their testimony in constitutional buzzwords and provided a narrative about the incident that is not believable. Under those circumstances, denying this motion would cut the heart out of the constitutional rights accorded any citizen, regardless of what city streets he drives. Demings motion to suppress the evidence of the gun and ammunition is granted; an appropriate order will be entered.