UNITED STATES of America

v.

John E. HOWARD, Defendant.

Criminal No. 08–662 (KSH).

United States District Court,
D. New Jersey.

May 19, 2011.

Randall Hastings Cook, Office of the U.S. Attorney, Newark, NJ, for United States of America.

K. Anthony Thomas, Office of the Federal Public Defender, Newark, NJ, for Defendant.

## OPINION

KATHARINE S. HAYDEN, District Judge.

The focus of this case is of constitutional dimension: the right of a citizen to be free from unreasonable search and seizure. The Court's decision on defendant John Howard's motion to suppress evidence turns not on complex legal issues but on the matter of credibility, the determination of which is the Court's responsibility. As the factfinder, the Court must be satisfied that it has come as close as possible to knowing what happened during the events in question—a stop and frisk at night on a street in Newark—as distinguished from accepting a story that fits a constitutional paradigm but fails to pass the test of common sense and logic.

The record before the Court establishes that John Howard, who is the subject of a pending indictment charging him as a felon in possession of a gun, was walking out of a known crack house in April, 2008, when two Newark police officers driving by in marked vehicles spotted him. The officers were on "proactive patrol," investigating criminal activity in high crime areas of the city. According to the police report filed after John Howard's arrest and testimony given before this Court, the arresting officers, Emanuel Pereira and Juan Ramos, decided to approach Howard because he appeared "startled" when he saw them and "quickly shoved" a black object he was holding in his right hand into the front part of his waistband. (Def. Ex. G). The report, which Pereira filed, describes further:

When suspect noticed that we exited our unit and were approaching him, he quickly turned around and began walking the opposite direction away from officers. Undersigned immediately advised suspect to stop and he complied. Officers then approached him and as we investigated whether suspect lived in building or in area, we noticed that he was very nervous and kept holding the front of his waist as if he was holding something there. At that point for officers safety, undersigned conducted a pat-down on suspect and revealed that in his front waistband there was a hard object which [was] like the handle of a gun. Feeling this, undersigned removed said object from suspect's waistband and found it to be a black semi-auto handgun.

Howard has moved to suppress the gun, a 9 millimeter semi-automatic handgun with a defaced serial number loaded with 9 millimeter Luger live rounds, which the government intends to use as evidence in prosecuting him for illegal possession of a weapon by a convicted felon pursuant to 18 U.S.C. § 922(g)(1). The Court held a hearing at which Pereira and Ramos testified for the government, and Howard and an investigator for the Office of the Public Defender testified for the defense. As will be seen, Howard advances evidence that directly contradicts the police version of events.

■ "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (citing *Simmons v. United States,* 390 U.S. 377, 389–390, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). In the case of a warrantless search, the government bears the burden to show that the search or seizure was reasonable. *United States v. Johnson,* 63 F.3d 242, 245 (3d Cir.1995) (citing *United States v. McKneely,* 6 F.3d 1447, 1453 (10th Cir.1993)). In deciding a motion to suppress evidence, the trial court determines the credibility of wit-

nesses. *United States v. Davis*, 514 F.2d 1085, 1088 (7th Cir.1975) (quoting *United States v. Conner*, 478 F.2d 1320, 1323 (7th Cir.1973)). As the finder of fact, the court can accept or reject any or all of a witness's testimony. *United States v. Murphy*, 402 F.Supp.2d 561, 569–70 (W.D.Pa. 2005) (citing *United States v. Conley*, 859 F.Supp. 830 (W.D.Pa.1994)). Credibility determinations "are to be made in consideration of numerous factors, including . . . the witness's ability to accurately recollect the matters at hand [and] ultimately, the extent to which [the testimony] withstands a common sense test of reason and logic." *Id.* The credibility of a defendant who testifies on his own behalf should be "judged in the same way as any other witness," and, likewise, a witness should "not to be judged more or less credible because the witness is a law enforcement officer." *Id.* (citations omitted).

At the hearing on Howard's suppression motion, the two officers gave testimony along the lines of the police report. When Howard testified, he claimed that what he was holding and using when the officers saw him was a black cellphone. The Federal Public Defender representing Howard moved Howard's cellphone and phone company records into evidence (over the government's objection, *see infra.*), which showed that the cellphone was in use during the relevant time. Howard denied that he shoved anything in the front waistband of his pants. He claimed that the police retrieved the weapon from the back of the waistband of his pants. He also denied that he was nervous during the face-to-face with the police because encounters with law enforcement in that neighborhood were frequent.

There is no mention of a cellphone in the police report or in Pereira's direct testimony. Pereira initially testified that he did not recall whether Howard had a cell-phone, and maintained on cross-examination that "it was not important" whether Howard did or did not have the phone. (Tr. Suppression Hr'g, July 30, 2009 ("Tr.1") at 59:20.) Only after being shown a personal property sheet, which Pereira had prepared and which stated that Howard had a phone with him when he was arrested, did Pereira recall that he had seized a cellphone from Howard when arresting him. (Tr.1 61:8–62:15.)

No one disputes that Howard had a gun on his person that was seized pursuant to a stop and frisk; the issue here is whether the seizure was constitutional. Since there is no place for a cellphone in the police version of the stop and frisk, the testimony of the government's witnesses and Howard cannot be reconciled. If the police are believed, then Pereira pulled a gun from the front waistband of Howard's pants, and that gun was the same object that Pereira testified he saw Howard "quickly shove" into the waistband moments before. (Tr.1 68:22–23.) So, under Pereira's version of events, what Howard had in his hand when the police first spotted him had to be a gun and not a cellphone. If Howard is believed, then what he had in his hand was a cellphone, not a gun, and he did not shove it or anything else in the front of his pants. To believe one side is to disbelieve the other. The Court must decide credibility—as *Murphy* put it, the Court must decide which version withstands "a common sense test of reason and logic." 402 F.Supp.2d at 569–70.

*Testimony of the Government Witnesses*

*Officer Emanuel Pereira:*

According to Pereira, he and Ramos were riding in a marked car behind another police vehicle, single file, convoy-style, in a high-crime area of Newark around 9 pm on April 29, 2008. (Tr.1 14:21–25.) Pereira sat in the passenger seat to "observe activity around us in the streets we

were patrolling." (Tr.1 15:18–19.) Because he was in the trail vehicle, he had an advantage: "Sometimes people are paying more attention to the lead vehicle and become nervous and spooked and begin doing things they are not supposed to be doing which allows me to observe them clearly on what they're doing." (Tr.1 15:25–16:3.) It was a clear night. The neighborhood, known for heavy drug trafficking, had experienced several recent shootings and the police were concentrating on 18 Stratford Place, which they rolled slowly by at 5 to 10 mph. (Tr.1 20:22–21:3.) They saw an individual step out of 18 Stratford and onto the sidewalk as the lead car, driven by fellow Newark police, passed him (Tr.1 22:8–9), and:

> Pereira: Well, when I observed him as he exited onto the sidewalk area, he noticed that Sergeant Venancio's patrol vehicle was right passed-right in front of him.
>
> Q: So in other words, he saw Sgt. Venancio and Nieves' vehicle, the front vehicle to his front?
>
> A: Right. At that point and my observation is, he just stopped, became real startled and quickly turned eastbound—I mean southbound towards us and shoved a black object that he held in his right-hand into his front waistband and walked down toward us. (Tr.1 23:18–24:2.)

Pereira recognized Howard, whom he knew from "all my years patrolling in the area." (Tr.1 25:5–8) Pereira believed the black object in Howard's right hand was "a weapon" or a "possible weapon," and told that to Ramos. (Tr.1 24:13–24.) Then:

> My next action was basically I told him to stop. I jumped out. As soon as I jumped out I jumped out to the sidewalk in front of the defendant.
>
> Q: Now, why did you do that?

> A: Because he was walking southbound towards us.
>
> Q: So you intended to investigate?
>
> A: Yes.
>
> Q: Why?
>
> A: Well, this action then, known building, recent shootings and what I observed him placing a black object in front of his waistband, arose[sic] my suspicions, you know, a possible weapon or something else, you know.
>
> Q: So you were concerned that the defendant might be engaged in some criminal activity?
>
> A: That's correct. (Tr.1 26:11–25.)

Venancio and Nieves, the officers in the lead car, went inside 18 Stratford Place per the plan to investigate activity there. Meanwhile, according to Pereira:

> I stepped out of the vehicle, I jumped out to the sidewalk in front of the suspect, in front of the defendant—I'm sorry. And as soon as he took notice of my presence, he quickly turned around and [was] facing northbound again towards Stratford Place—I mean, towards the Avon Avenue.
>
> Q: Okay. And what did he do at that time?
>
> A: At that time I—I asked him to stop and come back towards me. And at that point he basically quarter [turns] towards me and looked up towards—I guess towards the officers, and then he just completely turned towards me and walked towards my direction. * * * As he turned around towards me, he walked holding, like cupping in front of his waistband as if he was holding something and he just walked toward me.
>
> The Court: What was the thing that you just said? The last part of your statement.
>
> A: He was, as he walked towards me, he was cupping like the front of his

waistband as if he [was] holding something and he walked towards me.

The Court: As if he was holding something?

A: Yes.

* * *

Q: Did you have any concerns at that point that the defendant might be armed?

A: Yes, I did.

Q: Why?

A: Well, I observed him place a black object to his waistband, his mannerisms as he come back towards and he observing me and looking away from me and trying to walk away from me. I believe he was attempting or was thinking of fleeing. But when he did come towards me and I went towards him, he was cupping the front of his waistband where I did observe him place a black object." (Tr.1 30:2–12; 31:1–22.)

Pereira stated that, because he felt Howard "was thinking of fleeing on foot," and because Howard was walking toward him "cupping in front of his waistband where I did observe him place a black object" (Tr.1 32:12–15), he grabbed Howard's arm and "went to a pat down and I did feel that there was a hard object and a handle of a weapon in the front." (Tr.1 33:1–5.) Pereira pulled it out; Ramos had come out of the car and was at that point behind Howard. Pereira held the weapon to his side while he held onto Howard and Ramos placed Howard in handcuffs. (Tr.1 34–11–22.) Pereira testified that the weapon was in the same location "where I observed him place that black object." (Tr.1 37:8–9.)

Q: In conclusion, Officer Pereira, [would you summarize] why you stopped and searched the defendant that evening[?]

A: Well, one, the area being highly known for narcotics. And at that particular time of year and that particular couple of days there had been numerous shootings. He became startled as he observed the officers presence. I observed him placing a black object into the front of his waistband. Once he observed me he did look like he wanted to flee. And just the way he approached me, holding, cupping and holding his hands to the front of his waistband in like, in front of a placed black object." (Tr.1 38:4–14.)

When asked about the "black object," Pereira testified that he could not see its contours or shape (Tr.1 57:11–58–3), and acknowledged that the object could have been a bottle of soda, a wallet, a comb, a hair brush, or an Afro pick. (Tr.1 58:9–59:6.) The questioning continued:

Q: Could it have been a cell phone?

A: It could have been any black object.

Q: But it was none of those objects?

A: No, it wasn't.

Q: The night you arrested Mr. Howard did you see a cell phone?

A: Did I seize a cell phone?

Q: Yes.

A: I don't know if it was in his property or not. I didn't do his property.

Q: I didn't hear you.

A: I didn't take his property.

Q: Well, you searched him, correct?

A: At the scene for contraband and further weapons.

Q: Well, when you searched him, did you find a cell phone?

A: I can't recall. I can't recall. It was not important to me if he had a cell phone or not.

Q: Well, you would agree that a cell phone is a hard object, correct?

A: Yes.

Q: And if you touched an outer [layer] of somebody's clothing, and you feel that hard object, you would be interested into what it was, correct?

A: That is correct.

Q: And when you patted his outer garment down, you didn't—the only hard object you touched was a weapon?

A: Well, that was my target area and that is where I observed him place a black object into his waist.

Q: Well, did you search him to see whether he had any other hard objects on him?

A: A quick pat-down, yes.

The Court: I didn't hear you.

A: After the arrest, a search incidental to the arrest we patted down [for] any more contraband or for any more weapons.

Q: And you didn't find any additional hard objects on him?

A: I can't recall.

Q: Would anything refresh your memory as to whether you recovered a cell phone from Mr. Howard?

A: Maybe his personal property sheet, which is [not in] these reports. They go with him everywhere he goes to the cell block and to the county, those are all his personal stuff, not ours, and it's not part of our report.

* * *

Q: Let me show you what has been marked as defense exhibit H.

A: Okay.

Q: Does that document refresh your recollection as to whether you prepared a property sheet for Mr. Howard?

A: Yes, it does.

Q: And the reason why it refreshes your recollection is because it has your signature, correct?

A: Yes it does. (Tr.1 59:5–61:15.)

Confronted with the property sheet, which lists a cellphone and battery and was introduced as defense exhibit h, Pereira conceded that he had "seized" a phone from Howard. (Tr.1 62:10–15.)

Pereira further testified that he did not ask Howard any questions before patting him down. This was contrary to the police report, which indicated "we investigated whether the subject lived in the building or area," and, based on Howard's "nervous" conduct, "for the officer's safety the officer conducted a pat down on suspect." (Def. Ex. G.)

At the conclusion of spirited cross-examination, Pereira's testimony stood as follows: he saw a man exit 18 Stratford, a place known for drugs and other criminal activities, including shootings; he recognized the man from prior investigations; the man quickly shoved something into his front waistband, appearing startled; Pereira suspected the object was a gun ("It was in my thoughts, yes."); Pereira did not alert fellow officers going into 18 Stratford Place about his suspicion that Howard was armed, or un-holster his gun, or even have his hand on his gun before ordering Howard to stop.[1]

Q: Before you asked or ordered Mr. Howard to stop, you didn't seem him engage in any criminal activities, did you?

A: The only thing I observed him doing is shoving a black object into his waistband and holding onto his waist. (Tr.1 69:6–9.)

---

1. At the end of his testimony, in answer to a question from the Court, Pereira testified that it occurred to him as he walked toward How- ard that the black object might be a weapon, but he "just didn't take really much precaution." (Tr.1 101:25–102:1.)

Howard did not run when Pereira ordered him to stop, although Pereira testified that Howard "did look away from me as I told him to stop" (Tr.1 70:17), and while Howard neither protested nor pushed Pereira's hand away, Pereira maintained that Howard nonetheless "was still hesitant to keep his hands away from the front of his waist." (Tr.1 71:21–22). Pereira also testified that he did not consider Howard free to leave because he intended to conduct a *Terry* stop[2] based on his observations that Howard had shoved a black object into his waistband, appeared nervous, and still was cupping his waist. (Tr.1 73:1–18)

Q: And you know the parameters of a Terry Stop, correct?

A: Yes, I do.

Q: And it's your understanding that based on what you observed, Mr. Howard being startled, holding a black object, shoved in his waist, that's enough for a Terry Stop?

A: Yes, I do.

On redirect, Pereira testified that he was 30 feet away from Howard when he first saw him (Tr.1 85:3–4). Further, he stated that it was not relevant to an investigation for purposes of charging gun possession whether or not that the arrested individual had a cellphone. (Tr.1 88:21–89:12). Thus his testimony in response to the prosecutor's questions on redirect:

Q: After you initially, at the time that you initially observed the defendant place a black object into his waistband, could that object have been a cell phone?

A: Yes.

Q: But it could have been a gun?

A: Yes.

Q: And what in fact was it?

A: A gun. (Tr.1 91:4–11.)

Pereira clarified on re-cross that he approached Howard "to further investigate . . . whether or not he lived in the area or in the building or not . . . [and] what was the black object that he put in his waistband." (Tr.1 95:20–25.) He said he "had a hunch that the black object was a handgun" (Tr.1 97:4–6), but he did not include that detail in the police report. (Tr.1 99:16–19.)

*Officer Juan Ramos:*

Ramos testified that he was driving the trail vehicle that night because "[w]e go to several locations of high crime areas [and] address quality of life issues." (Tr.1 104:21–22.) He was familiar with the area where Howard was arrested and had himself made narcotics and firearms arrests on Stratford Place. (Tr.1 106:3–8.) The plan that night was to go into 18 Stratford and conduct a building check (Tr.1 107:13–15), which is where the policemen in the lead vehicle went while Ramos and Pereira were occupied with Howard. (Tr.1 109:22–110:6.) Ramos testified that as he was slowly driving behind the lead police vehicle, Pereira pointed out an individual walking down the street and told him to stop because the individual "just put something in his waistband." (Tr.1 108:2–3.) According to Ramos, it was Pereira who made the decision for the officers to stop Howard because at that point, "I wasn't intending to stop anyone outside of the building. We were entering the building to conduct a building check." (Tr.1 137:18–20.) The individual, whom he identified as Howard, "appeared to have his hands near his waistband." (Tr.1 109:13.) He testified that Howard complied with Pereira's order to come back towards him, but appeared hesitant. (Tr.1 111:24–25.) Ramos got out of the car and stood behind Howard, covering Pereira. (Tr.1 112:11–

**2.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

12.) He saw Pereira grab an object from Howard. (Tr.1 114:6–7.) When he heard Pereira use the code numbers for a person with a weapon, Ramos handcuffed Howard with his hands behind his back. (Tr.1 115:19–20.) Howard then was searched and placed in the police vehicle. (Tr.1 116:19.) Ramos testified that he acted as he did due to:

> Officer Pereira's observation of him, observing the individual inserting the object into his waistband, then his actions towards us, he was—appeared to be avoiding us as officers. The area is also highly known for crimes and I have been there on several homicide crimes and shootings also. (Tr.1 120:21–121:1.)

Between the time Ramos spotted Howard and the time when Pereira took the gun from him, about one minute elapsed. (Tr.1 122:22–123:6.) Ramos did not recall anyone asking questions of Howard. (Tr.1 131:18–19.)

*Defense Evidence and Testimony*

*Cellphone Evidence*

The defense contention throughout was that Howard had a cellphone in his hand when the police saw him walking out of the building, not a weapon. In support, the defense witnesses testified about Howard's cellphone use at the time of the encounter and the defense introduced into evidence his cellphone (black with a white stripe), as well as records subpoenaed from the wireless service provider, Sprint Nextel. This did not happen without strong objections by the government, which the Court overruled.

Prior to the testimony of the two defense witnesses, who were an investigator from the Federal Public Defender's Office, Carol Gillen, and Howard himself, the government challenged the relevance of whether Howard was holding a cellphone when first the police noticed him. On that basis, the government sought to exclude Gillen's testimony. The government further requested time to investigate Gillen's one-page report on activity on a cellphone proffered as belonging to Howard. The defense had turned over the report the evening before, along with the subpoenaed Sprint Nextel records showing cellphone activity from the day in question. In response, the defense argued that half of Gillen's report reflected what she saw as she scrolled down on the cellphone, and the other half reflected how Gillen had obtained the cellphone records, and as such, the report was standard *Jencks* material timely turned over in advance of her anticipated testimony. The defense further argued that the purpose of *Jencks* material is not to give a party the chance to investigate the *Jencks* material, but rather to provide the party with the opportunity to use the material to cross-examine the witness. For the defense, the real issue was the officers' credibility. The defense intended to use Howard's cellphone and the phone activity to establish that around the time that the police testified that they had encountered him, Howard was speaking on his cellphone.

The Court agreed with the defense that the issue before it was credibility, and determined, after hearing argument from both sides, that the defense had not been required to come forward with the cellphone records until after the police testified, and it denied the government's request for additional time or legal argument. Additionally, the Court determined that Gillen's testimony "was going to be saying something specifically on the issues that are in dispute on credibility grounds between Mr. Howard and the government witnesses." (Tr. Suppression Hr'g, Sept. 3, 2009 ("Tr.2") 14:5–8.) The Court permitted the defense to call Carol Gillen because "[t]he minute, exquisite,

careful[ ] scrutiny that is [being] given every second of the time ... requires that the Court hear from those folks who are prepared to swear to the truth of their version of the events." (Tr.2 14:9–14.)

After Gillen testified and when Howard was being cross-examined, the government again raised its objection to the defense strategy of turning over the cellphone evidence the evening before, arguing that the prosecution was "curtailed in our ability to ask about the subpoenaed records that the defense has offered as the basis to establish the credibility of this, this late night evidence that we received today." (Tr.2 140:13–16.) The Court specifically responded to this concern: "If, when you've examined the subpoenaed records that you got so late in the game, you find that there are reasons to reopen this hearing and blow Mr. Howard out of the water, I'm not going to stop you from doing that." (Tr.2 141:12–16.) The government never made a request to reopen.

The government returned to the issue of the turnover of cellphone evidence in its post-hearing brief. "Due to defense counsel's strategic decision to surprise the Government by concealing the cell phone evidence until the evening before the second day of the suppression hearing, there unfortunately was no opportunity to examine the police officers regarding this issue. For example, the officers were not closely queried regarding what precise time the stop took place because that fact was not known to be at issue." (Gov't's Post–Hr'g Br., D.E. 26 at 7.) This observation is, of course, disinguous because the government never sought to reopen to either question the officers or to attack the reliability or relevance of the subpoenaed phone records and activity on the cellphone. Moreover, the "surprise" the government complains about here is itself surprising because Pereira was asked 11 times by the defense, and 10 times by the government, about whether Howard had a cellphone that night. The defense specifically asked Pereira more than once if the object in Howard's hand could have been a cellphone. (Tr.1 59:5–6; 63:17–18.) In this context it must be emphasized that in meeting its burden of proving the seizure of the gun was reasonable and constitutional, the government committed to its witness's testimony that the black object that Pereira said he saw Howard "quickly shove" into his the front of his waistband was not a cellphone but rather the gun that Pereira pulled out.

Q: After you initially, at the time that you initially observed the defendant place a black object into his waistband, could that object have been a cellphone?

A: Yes.

Q: But it could have been a gun?

A: Yes.

Q: And in fact what was it?

A: A gun.

Finally, with regard to the government's objections that the cellphone evidence was not relevant, the Court disagrees. The cellphone evidence established that on the day of Howard's arrest, there was phone activity between 9:00 pm and 9:14 pm and thereafter no record of phone activity on the day of his arrest or the following day. This time frame brackets the encounter between Howard and the police: The government states in its pre-hearing brief (Gov't's Opp. to Def's Pre-trial Mots., D.E. 13 at 4) that police officers encountered Howard at approximately 9:10 pm; the police report (Def. Ex. G) fills in the "time of occurrence" box as 21:10 pm, and; Pereira testified that he stopped Howard "anywhere between 9:05, 9:10." (Tr.1 76:5–7.) The absence of further phone

activity in the phone records from the evening of Howard's arrest and the day after supports the confiscation of the phone on that night.

More specifically reviewing the testimony offered on behalf of Howard:

*Investigator Carol Gillen:*

Gillen testified that the phone records and her examination of the phone established that five calls were made on Howard's cellphone between 9:01 and 9:14 pm. The government conducted a vigorous cross-examination of Gillen about how she got the cellphone from Howard's great-grandmother and what she did afterwards. The Court gleaned the following:

> The Court: Is the witness here saying that she examined the cellphone, that Mr. Howard's great-grandmother said here's his phone and it was returned to me after he was arrested? And it was at that point dead and you powered it on and you looked to see what phone activity was registered on the phone? And you're testifying about the cluster of phone calls at about the time of the arrest as document[ed] in the police report?
>
> A: Yes. (Tr.2 70:14–22.)

*John Howard:*

When Howard testified, he identified the cellphone that Gillen testified about as the same type of phone he had on the night of the arrest, and stated that he was making and receiving calls on his cellphone when he was leaving 18 Stratford Place. He said that when he was brought to police headquarters, he had been asked what to do with his personal property, and that the Essex County Sheriff's Department had

returned the property, including the cellphone, to his grandmother. (Tr.2 105:12–18.) He identified the cellphone in the courtroom as his after recognizing names in the directory. He said the phone was a chirp phone (usable along the lines of a walkie-talkie).[3]

About his encounter with the police that night, Howard said that as he was leaving the building with the cellphone in his right hand, he heard someone call out, "You with the black jacket on, stop!" and he stopped. (Tr.2 94:1–6.) He identified the speaker as Pereira, who approached him with his partner and started asking questions. (Tr.2 94:21–25.) Howard testified that he stopped and answered the questions, standing with his hands by his side, his palms up, and his cellphone visible in his right hand. (Tr.2 95:6–96:14.) "So every time I get stopped by officers I make sure I show them my hands and where they should see them." (Tr.2 97:3–4.) He denied that he tucked the phone in his waist area, or that he had his hand in his waist area. (Tr.2 97:5–9.)

> Howard: When I seen the first Crown Vic, when I seen the first Crown Victoria, I started walking off the other direction. I never stopped or started. I'm going to go to the opposite direction and on the phone.
>
> Q: But [when] you saw the Crown Vic, were the police outside of the car or inside of the Crown Vic?
>
> A: No, they were just approaching, slowly coming up the block.
>
> Q: And [are] there a lot of police officers on Stratford Place?
>
> A: Yes. Police sit out there all day.

---

**3.** According to Howard's submissions, the phone had "direct/connect" capacity with a "push-to-talk" feature that directly connects two users so that they can talk for free by "chirping" without using the traditional 10-digit phone number. The connection is like a walkie-talkie connection but superior in that the callers can communicate over thousands of miles. (Def's Post–Hr'g Br. in Supp. of Suppression, D.E. 27 at 22 n.9.)

Q: Excuse me?

A: Police officers sit out there all day.

Q: And coming out of 18 Stratford, would you be startled at seeing a police office?

A: No.

Q: And you said they told—ordered you to stop, and you complied?

A: Yes.

Q: Now, what if anything happened after they asked—started asking you questions?

A: Well, after they started asking me do I live in the building or what I'm doing, ID, and he—I backed up to the wall, I just my back two steps away from the wall and so I just backed up. And then he checked the front of my pockets. And then after he checked the front of my pockets he said put your phone up. And after I put my phone up he just told me to turn around.

(The Court): All right, put up your phone?

A: Put my phone away.

Q: Where did you put your phone?

A: I put my phone in my right pocket after he told me to put it away.

Q: Now prior to the officer telling you or instructing you to put your phone away, did you at any time touch your front area or your body?

A: No.

Q: Now you said one of the [officers] tapped your pocket?

A: Yes.

Q: Could you explain what tapping your pocket means?

A: Well, when I puts my back against the wall, because they just going to search me, so I put my back—so he came towards me and he touched the front of my pocket—my front pocket. And after he finished tapping my front

pocket he told me to put your phone away. (Tr.2 97:12–99:6.)

During close questioning by the government, Howard stated that: he called his girlfriend (who had earlier called him) upon leaving 18 Stratford Place, and; he noticed the two police vehicles rolling slowly by, and he changed his destination, turning right, and "chirping" her with his cellphone. (Tr.2 129:14–135:12.) He testified that he changed direction so that he would not get questioned by the police. (Tr.2 133:11–15.) He also received a call from Hood, the friend whom he had been visiting. (Tr.2 131:3–14 and 137:2–5.) Howard was talking to Hood at the moment when he turned around, stopped and was approached by the officers. (Tr.2 147:1–12.)

**Findings/Discussion/Conclusion**

The Court finds that at the time the police encountered him, Howard was using the cellphone that was introduced into evidence. His identification of the phone, the Sprint Nextel records, and the property sheet signed by Pereira all provide ample and objective proof of cellphone use and cellphone presence. The countervailing evidence—Pereira's sworn testimony, which initially omits the cellphone and then deems it unimportant—is unconvincing and, once rejected, casts doubt upon his testimony as a whole. Especially at odds with the cellphone use that is established by the evidence is Pereira's testimony that Howard "quickly shoved" the black object he was holding down the front of his waistband. That gesture is highly unlikely if Howard was holding a cellphone. And if, for some bizarre reason, Howard did shove a cellphone in the front of his waistband, then both Pereira's and Ramos' testimony that he was making furtive cupping motions at his waist while walking towards them makes no sense. Furthermore, Pereira's testimony is that the black object he

saw Howard shove into his front waistband was the gun that Pereira pulled out of Howard's waistband.

The Court finds Howard's testimony was believable based on his demeanor and because his version of events is coherent and makes sense, and it is powerfully corroborated by the cellphone evidence. Because of this, there is simply no way to account for the version of events given by Pereira and Ramos—what they said they saw Howard do, why they stopped him, and under what circumstances they seized the gun he possessed—other than to conclude their version is not truthful. As such, the Court finds that Howard did not shove a black object in his right hand into the front of his waistband. The Court finds instead that he had a cellphone in his hand; that the police stopped him; that he did not make furtive gestures at his waist because he had no reason to; and after Howard complied with the directions to stop, the police briefly questioned him (but could not have learned anything to raise their suspicions because they denied questioning him at all when they testified); and that they patted Howard down in the manner he described, pulling a gun out of the back of his waistband.

■ Based on these findings, the *Terry* stop was unconstitutional. The facts the Court has found do not establish grounds for the police to reasonably suspect that Howard was engaged in criminal activity or that he posed a danger to the officers' safety.

In granting Howard's motion to suppress on grounds the *Terry* stop was illegal, the Court rejects the government's position in its post-hearing brief that Howard should be denied the remedy of the exclusionary rule. For this proposition, the government relies on language in *Herring v. United States,* 555 U.S. 135, 129 S.Ct. 695, 702, 172 L.Ed.2d 496 (2009) that

the exclusionary rule serves to deter conduct that is "deliberate, reckless, or grossly negligent." But where *Herring* really speaks to this case is in the broader pronouncement in the sentence just before that: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." The record and the court's observations of the witnesses' demeanor leave this Court with no doubt that the testimony of the officers was deliberate, that its content was not credible, and that the officers' culpability is at the bullseye of what the exclusionary rule seeks to deter.

However bad the neighborhood or notorious the actor, when required, police officers must come into court and tell the truth about how they performed a *Terry* stop. That did not happen here and the price of exclusion is appropriate. Doing otherwise would incur the much higher price of undermining the rule of law.

Howard's motion is granted. An appropriate order will be entered.